Anthony SIMMONDS, a/k/a Anthony Simmons, Petitioner–Appellant,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent–Appellee.

Docket No. 02–2135.

United States Court of Appeals, Second Circuit.

Argued: March 4, 2003.

Decided: April 21, 2003.

Randolph Z. Volkell, Merrick, New York, for Appellant.

Kristen Chapman, Assistant United States Attorney, for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York (Steven J. Kim, Varuni Nelson, Assistant United States Attorneys, of counsel), Brooklyn, New York, for Appellee.

Before: CALABRESI, POOLER, and SOTOMAYOR, Circuit Judges.

CALABRESI, Circuit Judge.

Anthony Simmonds, a prisoner serving an indeterminate life sentence in the State of New York, filed a habeas corpus petition in the United States District Court for the Eastern District of New York (Ross, J.) seeking to overturn an order that he be deported for his drug and weapon possession convictions. The INS obtained the disputed removal order as a result of proceedings held after Simmonds had begun serving his state sentence. Despite the fact that the INS itself had commenced Simmonds' removal proceedings,[1] the INS now argues that Simmonds' claims that the removal order is improper are not ripe and that, in any event, Simmonds is not in the custody of the INS. Although we find that Simmonds is in INS custody within the meaning of 28 U.S.C. § 2241, considerations of prudence lead us to order that his petition be dismissed as not ripe.

*Background*

Simmonds became a lawful permanent resident of the United States in 1982 at the age of 24 after marrying a United States citizen. Nine years later, he was convicted, following a jury trial in state court in New York, on an array of drug and weapon possession charges. The conviction resulted in concurrent sentences of imprisonment, with the longest being from twenty-three years to life. Under existing law, Simmonds will not be considered for parole until 2013.

In 1998, while Simmonds was in state prison serving his sentence, the INS began removal proceedings against him, based on his commission of an aggravated felony and his controlled substance violation. After failing, during the two-month continuance granted by the Immigration Judge ("IJ") for the purpose, to find an attorney to represent him, Simmonds defended himself at the removal hearing. At that hearing, Simmonds raised several issues: he challenged the retroactive effect of the repeal by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") of 8 U.S.C. § 1182(c); he pointed out that the Jamaican consulate had not been notified of the proceedings; and he expressed his concerns about the list of legal aid organizations that he had been given. The IJ, nonetheless, found him removable, ineligible for cancellation of removal, and ineligible for discretionary relief under former § 1182(c), and ordered him removed. The Board of Immigration Appeals dismissed Simmonds' administrative appeal of the IJ's decision.

Two years later, while still incarcerated in New York state prison, Simmonds filed a pro se § 2241 petition in district court. Simmonds contended that he was unconstitutionally denied an opportunity for § 1182(c) relief, that he was not provided with an up-to-date list of pro bono legal service organizations, and that, contrary to INS regulations, the Jamaican consulate was not notified of his removal proceedings. The district court dismissed the petition for want of jurisdiction. It held that Simmonds was not in the custody of the INS, because (a) Simmonds was not in the

---

1. Under 8 U.S.C. § 1228(a)(3)(A), the INS is directed to seek removal and, to the extent possible, to complete all administrative appeals from a removal order before a state prisoner is released when the order is based on the commission of an aggravated felony.

physical custody of the INS, and (b) the filing of a detainer by the INS with the state prison did not create custody. The district judge wrote, "This court adopts the majority view and finds that the INS detainer served merely a notice function such that petitioner is not in respondent's custody at this time." The court made no mention of the fact that Simmonds was under a final order of removal.

On appeal, we appointed counsel and asked the parties to address two questions. First, was the petition ripe for review in light of Simmonds' sentence of imprisonment in New York? Second, is Simmonds in the custody of the INS by virtue of his being under a final order of removal?

*Custody*

A jurisdictional prerequisite for the granting of a writ of habeas corpus under 28 U.S.C. § 2241 is that the petitioner be "in custody."[2] The provision relevant to this case states that the "writ of habeas corpus shall not extend to a prisoner unless ... [h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Although Simmonds is not, literally, a prisoner of the INS, courts have long recognized that the writ is available to those who, although not actually imprisoned, suffer such a curtailment of liberty as to render them "in custody." *See Jones v. Cunningham*, 371 U.S. 236, 239–40, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

The actions taken by the INS that may be argued to restrict Simmonds' liberty

include the filing of a "detainer" with state prison officials and the imposition of a final order of removal. The majority of circuits has held that the filing of a detainer, alone, does not create custody in the INS. *See Zolicoffer v. United States Dep't of Justice*, 315 F.3d 538, 540–41 (5th Cir.2003) (collecting cases and agreeing with the majority of circuits that, where there was no contention "that the INS actually has ordered [the alien's] deportation," the existence of an immigration detainer does not amount to custody). But this view has not been adopted unanimously. *See Vargas v. Swan*, 854 F.2d 1028 (7th Cir.1988).

■ Our circuit has not yet resolved the issue. *See Roldan v. Racette*, 984 F.2d 85, 88–89 (2d Cir.1993) (noting the majority and minority views but not reaching the question because the petitioner had failed to object to the magistrate's recommendation below); *see also Waldron v. INS*, 17 F.3d 511, 516 (2d Cir.1994). Nor should we in this case, because Simmonds' final order of removal is sufficient, by itself, to establish the requisite custody.[3]

Were it not for the fact that Simmonds is now being held in state prison, this conclusion would be a simple one. In cases in which the aliens ordered removed were not incarcerated, various courts of appeals have agreed that subjecting an alien to a final order of removal is to place that alien in custody within the meaning of the habeas statute. *See, e.g., Aguilera v. Kirkpatrick*, 241 F.3d 1286, 1291 (10th Cir. 2001); *Mustata v. United States Dep't of*

**2.** As we ordinarily do, we consider the jurisdictional issue (in the current case, custody) before other questions. *See, e.g.,* In re *Rationis Enters., Inc. of Panama*, 261 F.3d 264, 267 (2d Cir.2001). While ripeness may, in some instances, raise jurisdictional questions, in this case it only entails prudential ones.

**3.** Whether a final order of removal together with a detainer constitute custody was an

issue properly before us in *Duran v. Reno*, 193 F.3d 82 (2d Cir.1999) (appointing CJA counsel to argue this "issue of first impression"). That case was rendered moot, however, when Duran was legally, but prematurely, deported, and the opinion and order appointing counsel was vacated. *See Duran v. Reno*, 197 F.3d 63 (2d Cir.1999) *(per curiam )*.

*Justice,* 179 F.3d 1017, 1021 n. 4 (6th Cir.1999); *Nakaranurack v. United States,* 68 F.3d 290, 293 (9th Cir.1995). And we have held that an alien who has been released on bail from INS detention but is subject to a final order of removal is in INS custody. *See Henderson v. INS,* 157 F.3d 106 (2d Cir.1998).

The government insists, however, that Simmonds is not "subject to" the outstanding removal order, because that order cannot be executed while Simmonds remains in state prison. *See* 8 U.S.C. § 1231(a)(4)(A) (forbidding the Attorney General from removing an alien who is serving a sentence of imprisonment until after the alien is released, while allowing the removal of aliens who are on parole or on supervised release). But in this respect, Simmonds' position is the same as that of an ordinary habeas petitioner who seeks to attack a sentence of incarceration, in one jurisdiction, when that sentence was made consecutive to the one the petitioner is then serving in another jurisdiction. In such circumstances, it is well established that custody exists in both jurisdictions and hence that habeas may lie to attack the future sentence in such circumstances.

In *Frazier v. Wilkinson,* 842 F.2d 42 (2d Cir.1988), we reviewed the history of the Supreme Court's break from its previous rigid rule that habeas petitions may only be directed to the legality of a prisoner's current confinement. *Compare McNally v. Hill,* 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934), *overruled by Peyton v. Rowe,* 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968), *with Maleng v. Cook,* 490 U.S. 488, 493–94, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (*per curiam* ) (holding that a federal prisoner was in the custody of the State of Washington after Washington had lodged a detainer with federal authorities to ensure that, at the end of his federal sentence, the prisoner would be handed over to state authorities to serve a state sentence). Whereas the Supreme Court, to date, had recognized custody in a future jailor only where the immediate custodian, through the lodging of a detainer, was acting as an agent for the future jailor by holding the prisoner pursuant to the detainer, *Frazier* dispensed with the requirement that a detainer be in place. It stated:

> We think that habeas corpus may be used as long as there is a reasonable basis to apprehend that the jurisdiction that obtained the consecutive sentence will seek its enforcement. As the Supreme Court pointed out in *Peyton,* the interests of both the petitioner and the state are served by permitting habeas challenges to consecutive sentences prior to the commencement of their service. The policies of the Great Writ are surely not served by permitting a state to postpone, perhaps for many years, a challenge to its consecutive sentence by the simple expedient of deferring the filing of a detainer until close to the end of the initial sentence.

*Frazier,* 842 F.2d at 45.

The *Frazier* court went on to illustrate the "reasonable basis" standard by distinguishing consecutive sentencing cases from those in which future incarceration in state A could result from the violation of the terms of a prisoner's state A parole, when that violation occurred by virtue of the prisoner's conviction in state B, the jurisdiction that was currently jailing him. While the latter provides a basis on which a state might ultimately take custody, "it is by no means certain that it will expend resources" to do so. *Id.* "With a consecutive sentence, however, the absence of a detainer rarely leaves a state's intention in doubt. There is normally an expectation that a state imposing a consecutive sentence will insist that it be served." *Id.*

If *Frazier* is to be the guide for determining whether the INS has in its custody a state prisoner it has ordered removed, we must ask whether there is a reasonable basis to conclude that the INS will take custody of the prisoner upon his or her release from state prison. In Simmonds' case, we need not guess at the answer, since the INS is *required* to detain Simmonds at the start of Simmonds' 90–day removal period, which begins the moment New York releases him.[4] *See* 8 U.S.C. §§ 1231(a)(1)(B)(iii), 1231(a)(2) (mandating detention when the ground for removal is the commission of an aggravated felony or a crime relating to a controlled substance).

We see no reason why *Frazier* should not be applied here. Simmonds is incarcerated and is challenging subsequent custody. That custody will include physical confinement, in addition to the execution of an administrative order of "banishment," which we euphemistically call "removal." There is nothing in the nature of the liberty deprivation that Simmonds' future custody will bring about that distinguishes it, in a way relevant to the holding in *Frazier*, from that of a prisoner challenging a consecutive criminal sentence. We therefore hold that *Frazier* applies to alien prisoners challenging final removal orders and that, under *Frazier*, Simmonds is in INS custody for purposes of § 2241.[5]

*Ripeness*

"Ripeness" is a term that has been used to describe two overlapping threshold cri-

---

**4.** Of course there is the possibility that the law could change or that Simmonds might never be released from prison. But those possibilities were present in the situations involved in *Frazier* and *Maleng* as well and were not there thought to defeat custody. Moreover, given the possibility that Simmonds may be paroled, we cannot assume that he will never be released from state prison. *See Rummel v. Estelle*, 445 U.S. 263, 280–81, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (noting that while the absence of a right to parole precludes a court from treating an indeterminate life sentence as equivalent to a term of years, the possibility of parole must not be ignored and was, in that case, sufficient to distinguish such a sentence from a sentence of life without the possibility of parole). The government has presented us with no evidence or argument that Simmonds' parole is likely never to occur. The New York State Parole Board considers numerous factors in making parole decisions, and we cannot know, at this time, whether those factors will favor or disfavor Simmonds' parole when he becomes eligible. *See Silmon v. Travis*, 95 N.Y.2d 470, 476–77, 718 N.Y.S.2d 704, 741 N.E.2d 501 (2000) (describing discretion of the Parole Board in New York to weigh various statutory factors in arriving at parole decisions).

**5.** Our conclusion in this case is the same as that reached by the Tenth Circuit in a pre-IIRIRA case, *Galaviz–Medina v. Wooten*, 27 F.3d 487 (10th Cir.1994), but our reasoning is slightly different. The panel in *Galaviz–Medina* found that a federal prisoner subject to an INS detainer and a final order of removal was in the custody of the INS, because the removal order gave the INS a right to the future, direct custody of the prisoner and because the order gave the INS "a more concrete interest" in the prisoner than it had in the aliens whose claims of INS custody rested on INS detainers alone. *Id.* at 493.

As we have noted, IIRIRA, by *requiring* the INS to detain Simmonds as soon as he is released from state prison, has created a fundamental legal distinction between prisoners who, like Simmonds, are subject to a final order of removal and those subject only to an INS detainer. We need not, therefore, rely, as did the Tenth Circuit in *Galaviz–Medina*, on the heightened level of INS interest in a prisoner manifested by the existence of a final order of removal. Accordingly, nor need we base our determination on the *right* of the INS to act on the removal order. And we leave open those possible grounds for jurisdiction. For when, as here, the legal consequences of a removal order are mandatory detention and the commencement of procedures to execute the order, the existence of the order is conclusive evidence of the INS's intention to assert custody. And that is all that is required under *Frazier* to find that custody currently exists in the INS.

teria for the exercise of a federal court's jurisdiction. *See Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57, n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). Both are concerned with whether a case has been brought prematurely, but they protect against prematureness in different ways and for different reasons. The first of these ripeness requirements has as its source the Case or Controversy Clause of Article III of the Constitution, and hence goes, in a fundamental way, to the existence of jurisdiction. The second is a more flexible doctrine of judicial prudence, and constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it. *See, e.g., Tassy v. Brunswick Hosp. Ctr., Inc.,* 296 F.3d 65, 68 n. 2 (2d Cir.2002) (noting that the exercise of jurisdiction where it exists is a "virtually unflagging obligation" of federal courts (quotation marks omitted)).

■ These two forms of ripeness are not coextensive in purpose. Constitutional ripeness is a doctrine that, like standing, is a limitation on the power of the judiciary. It prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it. But when a court declares that a case is not prudentially ripe, it means that the case will be *better* decided later and that the parties will not have constitutional rights undermined by the delay. It does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III. Of course, in deciding whether "better" means later, the court must consider the likelihood that some of the parties will be made worse off on account of the delay. But that, and its degree, is just one—albeit important—factor the court must consider. Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial. *See* Alexander M. Bickel, *The Supreme Court 1960 Term Foreword: The Passive Virtues,* 75 Harv. L.Rev. 40, 58–64 (1961).

■ The two prematureness doctrines have often been referred to simply as "ripeness," an understandable usage since a determination that a case is not "ripe," under either doctrine, results in dismissal, either for lack of jurisdiction or pursuant to a refusal to exercise jurisdiction. *See, e.g., Marchi v. Bd. of Coop. Educ. Servs.,* 173 F.3d 469, 478 (2d Cir.1999) (noting that ripeness is required by Article III and not distinguishing the elements of ripeness review that are prudential). Usually it does not matter to the parties whether a case is dismissed for lack of constitutional or prudential ripeness. And, indeed, it does not matter to them in the case before us. However, since prudential rules are, after all, prudential and, thus, more mutable and more responsive to fact-intensive inquiries into context than constitutional ones, it is worth, from time to time, distinguishing the two notions. *See, e.g., McInnis–Misenor v. Maine Med. Ctr.,* 319 F.3d 63, 69–70 (1st Cir.2003) (discussing the differences between prudential and constitutional ripeness).[6] Rules of prudence, recognized as such, can then be more easi-

---

**6.** Distinguishing them is also important because a court's exercise of jurisdiction in the absence of constitutional ripeness is subject to all those forms of attack that can be made on judgments issued by a court that lacks jurisdiction. A court's error in failing to dismiss on the basis of prudential ripeness is not similarly challengeable.

ly scrutinized for their success in promoting better judicial decisionmaking, without confusing them with their more fundamental and more rigid, constitutionally-based cousins.[7]

■■■ "To the extent that issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' [a] conclusion that [the complaining party] will sustain immediate injury ... and that such injury would be redressed by the relief requested would appear to satisfy this [constitutional] requirement." *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 81, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (internal citation and quotation marks omitted). While this language in *Duke Power* suggests that a plaintiff's *standing* may be enough, in many circumstances, to render a claim ripe under Article III, we do not foreclose the possibility that a case may be rendered sufficiently abstract by its prematurity as to cause it to fail the requirements of Article III in other ways. Nevertheless, we need not be troubled long with whatever additional

burden beyond that of demonstrating standing may be placed on a plaintiff by constitutional ripeness. For Simmonds' claims surely present a live case or controversy. He attacks a final order of removal, which, but for a favorable result in a habeas corpus proceeding, will result in his detention and ultimate deportation by the INS. It is true that the fact that Simmonds is now serving an indeterminate life sentence in state prison makes the injury he claims he will sustain from the INS less than absolutely certain. But *absolute* certainty of injury is not required for a case to be constitutionally ripe. Given (a) the availability of parole, (b) our assumption that parole is a regular part of the criminal punishment system in New York, *see* note 4, *supra*, and (c) the clarity of the law that commands Simmonds' detention and deportation after he is granted parole, we readily conclude that the imposition of a final order of removal against Simmonds represents a concrete injury and that the challenges Simmonds makes to that order are well-defined and not hypothetical.[8]

---

7. The notion of ripeness, as a doctrine of prudence, has become a staple in the adjudication of claims that a state or municipality has taken property without providing just compensation. In that context, a plaintiff must obtain a final decision from the regulatory body that the plaintiff alleges has taken his or her property, and the plaintiff must also seek compensation through any procedures the state has in place. *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733–34, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). Until a plaintiff can demonstrate that both of these requirements are met, the plaintiff's regulatory takings claim is generally deemed not ripe. *Id.* But since the doctrine is driven by judicial prudence rather than the Constitution, a court is free to exercise jurisdiction over such a case when the circumstances so warrant. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1012–13, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (noting that a takings plaintiff's opportunity to apply for a special permit "goes only to the prudential 'ripeness'" and deciding that prudence dic-

tated that the Court reach the merits in that case—given that Article III injury had properly been alleged—since the special permit scheme that the plaintiff had not complied with had been established only late in the litigation).

8. We are supported in this conclusion by the fact that, although Article III ripeness is a constitutionally mandated jurisdictional prerequisite, and so its absence must be noted by a court *sua sponte*, *see Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998), constitutional ripeness was not deemed to be lacking in *Frazier, Maleng*, or any of the other consecutive sentencing cases. None of those cases involved a prisoner whose first sentence was an indeterminate life sentence, true. But the possibility that the petitioners in those cases might have died, received a pardon, or benefitted from a change in state law before beginning their second sentence of incarceration was evidently not thought to create such uncertainty that the attack on the

■ Our finding that Simmonds' claims are ripe for purposes of Article III does not, however, end the inquiry. For the government argues that it is not prudent for us to hear this case now, rather than at some later point, when the issues will be more amenable to a final resolution in the district court and still before the parties will have suffered any real hardship as a result of the delay. Mindful of our duty generally to exercise jurisdiction when it exists, we nonetheless conclude that this case will be better resolved at a time closer to Simmonds' parole.

In this determination, we are guided by the Supreme Court's general framework for analyzing the prudence of hearing a claim of future injury. And so we ask: (1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). While these questions are also relevant to the constitutional ripeness determination, we confront them here to decide only whether Simmonds' claims would *better* be heard now or at some point in the future. Because by waiting to render a decision in this case we would (a) increase the chance that the proper law is applied to Simmonds' claims, (b) reduce the chance that multiple habeas proceedings will occur, and (c) save ourselves and the district court from issuing a decision that may turn out to be unnecessary, and because (d) Simmonds has not demonstrated that he would be harmed by our delaying a decision, we find his petition not to be ripe.

*Fitness*

We have noted that the "fitness" analysis "is concerned with whether the issues sought to be adjudicated are contingent on

future events or may never occur." *Isaacs v. Bowen,* 865 F.2d 468, 478 (2d Cir.1989). In *Isaacs,* the plaintiffs attacked "the proposed substitution of in-house Medicare [Administrative Law Judges] in place of existing Social Security ALJs." *Id.* at 477. But the proposal and its consequences, were such an action to be taken, were as yet anything but certain. The court found that the plaintiffs' claim was "directed at possibilities and proposals only, not at a concrete plan which has been formally promulgated and brought into operation." *Id.* Conversely, issues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now. *See Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 479, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001); *Duke Power Co.,* 438 U.S. at 81–82, 98 S.Ct. 2620. Thus, in *American Trucking Associations,* the Court noted that rendering a decision on the legality of the challenged regulations would not "inappropriately interfere with further administrative action, since the EPA has concluded its consideration of the implementation issue." 531 U.S. at 479, 121 S.Ct. 903 (citation and quotation marks omitted).

In the instant case, the INS itself argues (although for the purpose of demonstrating that Simmonds will incur no hardship if his case is delayed) that the district court will need to make no new factual findings. Furthermore, Simmonds has exhausted his administrative appeals, and the government, in the absence of a change in the law or of direction from a federal court, will engage in no further consideration of Simmonds' claims. These factors tend to suggest that the issues Simmonds raises are as fit for judicial review now as they will ever be.

second sentence would present a hypothetical    case, in a constitutional sense.

But there are also factors in this case that run in the opposite direction, and they do so strongly. Although Simmonds' parole is not so uncertain as to create a purely hypothetical case unfit for review under Article III, the uncertainty that exists, at this time, over "whether or when" Simmonds will be detained by the INS and the removal order against him executed does reduce the adjudicative fitness of the issues he raises. *See Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998). It is also the case that laws dealing with immigration, removal, and the rights of aliens have been especially changeable in recent years. *See, e.g., INS v. St. Cyr*, 533 U.S. 289, 297, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (describing three statutory changes to the law governing discretionary waivers of deportation which occurred in the 1990s alone). What the law will be when and if Simmonds comes to be detained by the INS is, therefore, anything but clear.

As a result, it is quite possible that a resolution of Simmonds' current claims will not be necessary in the future, because (a) it becomes clear that parole will never be granted, (b) the law changes, making it plain even to the INS that Simmonds' removal order may not be executed, or (c) the law changes in ways that make any decision now in Simmonds' favor of no help to him when his removal would, in fact, occur. For the latter two reasons, it might also become the case that we could be forced to revisit in future proceedings,

habeas or otherwise, whatever we might decide now. There can be no doubt, moreover, that we and the district court will be in a better position to evaluate Simmonds' claims, should a court decision continue to be necessary, at a time closer to the moment at which the removal order will exert a substantial adverse effect on Simmonds.

*Hardship*

■ "In assessing the possible hardship to the parties resulting from withholding judicial resolution, we ask whether the challenged action creates a direct and immediate dilemma for the parties." *Marchi*, 173 F.3d at 478. The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship. *Id.* at 478–79.

■ Simmonds puts forth two arguments that he will endure hardship if his ability to petition for a writ of habeas corpus is delayed.[9] First, he notes that if his petition is successful he would be able to avoid being detained by the INS at the expiration of his state sentence, and thus avoid additional custody. However, delay in considering Simmonds' petition will only subject him to that additional custody if he is prevented from mounting his habeas challenge to the removal order until after he is released from state prison. We expressly do not hold here that Simmonds must wait until *after* his release from state prison to bring his petition, only that his claims are not ripe *at the moment*.[10] Be-

---

9. At oral argument, Simmonds' counsel expressly conceded that Simmonds will not be treated any differently in state prison as a result of his immigration status.

10. We recognize that there have been instances where, for a variety of reasons, a petitioner has been deported before a court has had an opportunity to rule on the pending habeas petition. *See, e.g., Fuller v. INS*, 144 F.Supp.2d 72 (D.Conn.2000) (petitioner deported while habeas petition was pending);

*Louise v. Costello*, No. 01–CIV–3987, 2002 WL 1446618 (S.D.N.Y. July 2, 2002) (same). We therefore also recognize that delaying consideration of Simmonds' petition until after he is released from state custody might subject him to hardship. That said, we need not, at this time, decide the precise point before his release from state prison at which Simmonds' claims will become ripe. We cannot know now whether or how Simmonds' parole determination will depend on his immigration sta-

cause Simmonds' first opportunity for release on parole is ten years in the future, our holding in no way puts him at risk of suffering unnecessary detention.

Second, Simmonds, in his brief, states generally that his ability to present his case may be adversely affected by a delay of many years. This assertion is unsupported by any specific references in his brief. Under the circumstances, we cannot conclude that Simmonds will suffer any significant hardship from a delay in the adjudication of the issues he raises in his current petition.

*Conclusion*

While Simmonds is in the custody of the INS, and thus not barred by the terms of 28 U.S.C. § 2241 from bringing a habeas corpus challenge to his removal order, there exist substantial reasons why that challenge ought not to be considered now rather than at a time closer to Simmonds' opportunity for parole. His claims are not fully fit for review at this time, and he has not demonstrated any discernible hardship that he would endure as a result of delaying the adjudication of his petition. Such being the case, Simmonds' claims are—for prudential reasons—not suitable for current adjudication.

We have considered all of Petitioner's other arguments and have found them meritless. Because the case is, on prudential grounds, not ripe, we decline to exercise jurisdiction and DISMISS the petition without prejudice to Simmonds' ability to bring a new petition for habeas corpus based on the same claims he has raised in the current petition at such time as those claims become ripe.

tus. Nor can we be certain, at the moment, whether Simmonds will be detained, as current law requires, following his parole. Both of these issues will be best considered at a later time, when it becomes clearer what laws and regulations will be applied by New York, in determining whether Simmonds should be paroled, and by the INS, in seeking to execute the removal order.