06-4895-cv
*N.Y. Civil Liberties Union v. Grandeau*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: March 7, 2008                                    Decided: June 6, 2008)

Docket No. 06-4895-cv

_____

NEW YORK CIVIL LIBERTIES UNION,

*Plaintiff-Appellant*,

—v.—

DAVID GRANDEAU, Executive Director of the New York State
Temporary State Commission on Lobbying,

*Defendant-Appellee*.

_____

Before:      SOTOMAYOR and RAGGI, *Circuit Judges*, GLEESON, *District Judge*.[*]

_____

Plaintiff-appellant the New York Civil Liberties Union ("NYCLU") appeals from a September 28, 2006 judgment of the United States District Court for the Southern District of New York (Preska, J.), dismissing as moot its complaint against defendant-appellee David Grandeau, in his capacity as Executive Director of the New York Temporary State Commission on Lobbying. Unlike the district court, we do not conclude that this case was moot, but we nevertheless uphold the district court's grant of summary judgment in favor of the defendant and dismissal of the complaint because the NYCLU's First Amendment challenge is not, as a prudential matter, ripe for judicial review. Accordingly, we AFFIRM the district court's judgment.

----

[*] The Honorable John Gleeson of the United States District Court for the Eastern District of New York, sitting by designation.

CHRISTOPHER DUNN (Arthur Eisenberg, *on the brief*), New York Civil Liberties Union Foundation, New York, New York, *for plaintiff-appellant*.

SASHA SAMBERG-CHAMPION, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Michelle Aronowitz, Deputy Solicitor General, *on the brief*), *for* Andrew M. Cuomo, Attorney General of the State of New York, New York, New York, *for defendant-appellee*.

SOTOMAYOR, *Circuit Judge*:

Plaintiff-appellant the New York Civil Liberties Union ("NYCLU") appeals from a September 28, 2006 judgment of the United States District Court for the Southern District of New York (Preska, J.), dismissing as moot its complaint against defendant-appellee David Grandeau, in his capacity as Executive Director of the New York Temporary State Commission on Lobbying ("Grandeau" and the "Commission"). *See N.Y. Civil Liberties Union v. Grandeau*, 453 F. Supp. 2d 800 (S.D.N.Y. 2006). This case arises out of the Commission's inquiry into whether the NYCLU incurred reportable lobbying expenses in connection with a billboard promoting awareness of free speech issues in private shopping malls erected near the Crossgates Mall in Albany, New York. After receiving the Commission's request for additional information on its billboard expenses, the NYCLU filed a complaint alleging that the Commission's demand for reporting on expenses for non-lobbying advocacy activity violates the First Amendment. Although the Commission ultimately abandoned its demand for additional reporting by the NYCLU on the billboard, we cannot agree with the district court's finding that this case moot because the NYCLU's complaint challenged an alleged Commission policy beyond the specific billboard controversy. Nevertheless, we conclude as a prudential matter that the NYCLU's

-2-

policy challenge is not ripe for judicial review. We therefore AFFIRM the district court's grant of summary judgment in favor of the defendant and dismissal of the complaint.

## BACKGROUND

In 1981, the New York State Assembly enacted the Lobbying Act (the "Act"), designed "to preserve and maintain the integrity of the governmental decision-making process in the state" by requiring disclosure of the "identity, expenditures, and activities" of people or organizations involved in influencing state decision-making processes in certain ways. N.Y. Legis. Law § 1-a.[1] The Act contains a series of restrictions and reporting requirements for individuals and entities that engage in lobbying activities. "Lobbying activities" are defined as "any attempt to influence" governmental decision-making in a variety of forms, including, *inter alia*, "the passage or defeat of any legislation by either house of the state legislature or approval or disapproval of any legislation by the governor." § 1-c(c). The Act requires every lobbyist to register with the Commission and file regular reports containing detailed information on its lobbying activities. *See, e.g.*, § 1-h(b)(3) (requiring a description of the subject matter and legislative bill numbers associated with lobbying activities). These reports must also list "any expenses expended, received or incurred by the lobbyist for the purposes of lobbying," § 1-h(b)(5)(i), and, except for expenses under seventy-five dollars, detail those expenses "as to amount, to whom paid, and for what purpose," § 1-h(b)(5)(ii).

The NYCLU is a not-for-profit membership organization that engages in "a full range of

---

[1] The Act was recently amended by the Public Employee Ethics Reform Act, effective April 25, 2007. 2007 N.Y. Sess. Laws ch. 14, A. 3736-A (McKinney). None of the substantive provisions at issue in this case were amended, although the New York State Temporary Commission on Lobbying was abolished and its duties have been replaced by the Commission on Public Integrity. *See id.* § 2. For the sake of consistency, we refer simply to "the Commission."

advocacy, including lobbying, litigation, and public education." Compl. ¶ 10. It routinely files reports with the Commission about its lobbying activities. According to the NYCLU, "[o]n many issues about which it lobbies, the NYCLU also engages in a range of advocacy that is not lobbying: that is, does not involve communications with lawmakers or other relevant public officials. That advocacy includes, but is not limited to, public rallies, reports, newsletters, communications through media outlets, op-ed pieces, websites, reports, films, and flyers." Appellant's Br. 8.

One such advocacy initiative was the Crossgates Mall billboard. In March 2003, Stephen Downs was arrested at the Crossgates Mall for wearing a t-shirt bearing the words "Give Peace a Chance," in reference to the impending war in Iraq, and for refusing to take it off when told to do so by mall security. Compl. ¶ 14. His arrest triggered a wave of media attention, and the NYCLU became involved in challenging what it deemed to be an abridgement of Mr. Downs' free speech rights.[2] According to the NYCLU, a third party approached it seeking to collaborate on a billboard, to be placed near the Crossgates Mall, promoting free-speech rights at shopping malls. Compl. ¶ 19. Independently and subsequent to that solicitation, a New York State Assembly Member prepared a bill proposing to entitle New Yorkers to exercise certain free-speech rights in shopping malls in the state. "Consistent with its position on this issue and with its longtime participation in legislative advocacy, the NYCLU extensively communicated with the Assembly Member about development of this proposal and publicly endorsed the proposal at

---

[2] The NYCLU wrote to the private management company that owned the mall, and the NYCLU's Legal Director spoke out publicly against the arrest. In addition, shortly after the criminal charges against Mr. Downs were withdrawn, he retained the NYCLU to represent him in possible civil proceedings associated with the arrest. At the time the NYCLU filed its complaint, it still represented Mr. Downs. Compl. ¶¶ 16-18.

a news conference" in March 2003. Compl. ¶ 21. At the same time the NYCLU endorsed the legislative proposal, it announced the unveiling of the billboard near Crossgates Mall. The billboard featured an image of a person who was gagged and included the following text: "Welcome to the mall. You have the right to remain silent. Value free speech. www.nyclu.org." The billboard did not mention any legislative proposal or call upon anyone to take action with respect to the proposal. It remained up for one month. Compl. ¶ 22.

In its semi-annual report on lobbying activities in July 2003, the NYCLU reported "all lobbying work done in conjunction with the New York State Assembly bill, including its appearance at the [March] press conference." Compl. ¶ 25. It did not, however, include information about the billboard or any of NYCLU's "nonlobbying work concerning free speech rights in shopping malls." *Id.*

On October 28, 2003, the NYCLU received a letter from a program analyst at the Commission stating, in pertinent part, "reportable lobbying expenses include the funding of parties, receptions, and all events which are hosted by the client with a special interest in pending legislation. . . . The Commission is aware of an expense for advertising on a billboard. It appears that certain costs of this event are reportable lobbying expenses and, therefore, must be reported as such." Five days later, the NYCLU filed its complaint. The complaint was assigned to Judge Preska as a case related to another matter pending on her docket, *Hip-Hop Summit Action Network v. New York Temporary State Commission on Lobbying*, No. 03-civ-5553, 2003 WL 22832569 (S.D.N.Y. Nov. 25, 2003), which principally involved a First Amendment challenge to the Commission's investigation of certain individuals alleged to be lobbyists but who failed to

-5-

register with the Commission.[3]  *Id.*  The NYCLU's complaint in the instant action alleged that the Commission violated the First Amendment by insisting that it "report as lobbying advocacy that makes no mention of pending legislation nor exhorts any action with respect to pending legislation, *including but not limited to its erection of the billboard outside the Crossgates Mall.*"  Compl. ¶ 41 (emphasis added).  The NYCLU sought a declaratory judgment along with a preliminary and permanent injunction to prevent the Commission from forcing the NYCLU to report such alleged non-lobbying advocacy activities.

Two days after the NYCLU filed its complaint, on November 5, 2003, Grandeau sent a letter to the NYCLU stating that it did not need to respond to the Commission's request for reporting on the billboard because "[i]t has been determined that the billboard in question was not paid for by NYCLU; and as such it should not be included as a reportable lobbying expense on your . . . Semi-Annual Report."  The next day, the NYCLU sent a letter to Assistant Attorney General James Henly explaining that withdrawal of the Commission's request "does not resolve the controversy that led us to file our federal challenge earlier this week" because resolution "cannot and should not be based on the incorrect conclusion that the NYCLU did not incur expenses with respect to the billboard."  The NYCLU stated that it had incurred expenses on the

---

[3]  The plaintiffs in *Hip-Hop Summit* were the subject of an investigation by the Commission, allegedly prompted by their role in organizing a rally at City Hall in Manhattan that was intended to raise public awareness of the Rockefeller Drug Laws.  *See Hip-Hop Summit*, 2003 WL 22832569, at *1.  The plaintiffs, two individuals who co-founded Hip-Hop Summit Action Network, alleged that "the Commission's investigation of [their] activities and threat of subpoenas, civil fines, additional investigations and the prospect of being required to register as lobbyists penalize [them] for exercising their First Amendment rights and have a chilling effect on their exercise of those rights."  *Id.*  Judge Preska dismissed the case on abstention grounds under *Younger v. Harris*, 401 U.S. 37 (1971), and therefore did not reach the merits of their challenge.  *Id.* at *6.

billboard[4] and therefore "any resolution of this dispute must be based on an acknowledgment that the NYCLU's free speech billboard is not lobbying activity subject to reporting." The Attorney General's office responded with a two-sentence letter reiterating that the Commission did not seek reporting related to the billboard, and that the office considered the case moot. The NYCLU followed with another letter stating its belief that the case was not moot because the Commission continued to assert the billboard was part of a lobbying effort. On December 4, 2003, Commission counsel Ralph Miccio sent the NYCLU a letter stating that the Commission's position "has never been that the billboard in and of itself constitutes lobbying, but rather, its use as part of a lobbying campaign would make the cost of the billboard a reportable lobbying expense *if paid for by a registered lobbyist.*" Miccio stated that the Commission's investigation revealed that the NYCLU had not paid for the billboard.

On December 15, 2003, the Commission moved to dismiss the action on *Younger* abstention grounds because a proceeding before the Commission was ongoing. In a reply memorandum on December 19, 2003, the Commission then "took the contradictory position that its inquiry into the [b]illboard was closed and that the action should be dismissed as moot." *See N.Y. Civil Liberties Union v. Grandeau*, 453 F. Supp. 2d 800, 803 (S.D.N.Y. 2006) ("*Grandeau II*"). The district court denied the Commission's motion to dismiss the case as moot, citing four factors:

> (1) the contradictory positions taken by the Commission in this matter; (2) the disputed basis on which the Commission has withdrawn its request/demand for filing regarding the Billboard; (3) the appearance that the Commission's withdrawals have been in response to litigation brought by the NYCLU; and (4)

---

[4] It is unclear whether the NYCLU maintains that it *paid for* the billboard or merely incurred expenses in connection with its collaboration with whoever actually paid for the billboard. Resolution of this issue is not relevant to this appeal.

the narrowly drawn "present intention" declaration provided by the Commission in support of the present motion.

*N.Y. Civil Liberties Union v. Grandeau*, 305 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2004) ("*Grandeau I*").

Following this decision, the Commission passed a resolution affirming that it did not seek, and would not seek, additional information from the NYCLU regarding the Crossgates Mall billboard. The case also moved forward in the district court with depositions and limited discovery, after which both parties moved for summary judgment. The district court granted the defendant's motion for summary judgment, concluding that the case was moot for two reasons. First, the district court reasoned that the Commission's resolution indicated that it had closed the billboard inquiry "complete[ly] and irrevocabl[y], obviating the concern that it will recur." *Grandeau II*, 453 F. Supp. 2d at 806. Second, in response to the NYCLU's claim that the Commission's alleged policy of seeking information on non-lobbying activity was likely to recur, the court found that "the alleged Commission policy . . . is not presented on the facts of this case." *Id.* The court therefore concluded that "there is, therefore, no substantial, real, and immediate controversy between the parties," and "[a]ny decision construing the reach of the Commission's policy would amount to an advisory opinion." *Id.*

The NYCLU appeals, urging us to reverse the district court's mootness determination and to decide the merits of its First Amendment challenge.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party and drawing all permissible inferences in its favor. *Niagra Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

Whether a case is moot presents a legal issue that we also review *de novo*. *White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 167 (2d Cir. 2007).

## I.     Mootness

The NYCLU is not appealing the district court's determination that its challenge to the Commission's billboard inquiry is moot.[5]  Our mootness review therefore encompasses only whether, in the absence of a dispute about the Crossgates Mall billboard, the NYCLU's entire case is moot.

The district court's mootness determination appears to rest on a premature assumption that certain facts were not in dispute.  The court stated that "[b]oth sides are in agreement that expenses incurred as part of the NYCLU's non-lobbying activities, including placement of the Billboard at issue in this case, are not reportable as lobbying expenses unless they are part of a lobbying effort." *Grandeau II*, 453 F. Supp. 2d at 806.  The court then stated that "[t]he undisputed facts at the summary judgment stage show that the NYCLU's Billboard effort was separate and apart from [its] lobbying activity." *Id.*  In fact, the parties did not agree on whether the billboard could be deemed part of a lobbying effort.  The NYCLU maintained that any expenses incurred in erecting the billboard were not reportable because the billboard was non-lobbying advocacy.  The Commission, however, never agreed that the billboard expenses, if

_____

[5] The NYCLU does not, however, concede mootness of the billboard dispute.  Rather, it suggests that the Commission may not have met its "formidable burden" under the "stringent" standard for determining whether "a case has been mooted by the defendant's voluntary conduct." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189-90 (2000); *see also Lamar Adver. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 375 (2d Cir. 2004) (stating that "voluntary cessation of allegedly illegal conduct usually will render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur *and* (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation" (emphasis added) (internal quotation marks omitted)).

incurred by NYCLU, were not reportable; its retreat was based on a determination that the NYCLU had not paid for the billboard. Indeed, the Commission assiduously maintained that billboard expenses were reportable if paid for by a registered lobbyist and part of a lobbying effort. In short, the parties were (and, as best we can tell on the current record, continue to be) in disagreement about what activities are reportable, either because they were lobbying or because they were in support of a lobbying effort.

This ongoing disagreement about what activities are reportable is reflected in the complaint as a challenge to the Commission's alleged policy of targeting non-lobbying advocacy work for reporting and investigation and supports the NYCLU's argument that this case is not moot. For example, the complaint alleges, *inter alia*, that the Commission's "effort to extend the . . . lobbying reporting and disclosure regime to advocacy that makes no mention of any pending legislation and that calls for no action on any such legislation substantially and unnecessarily burdens the First Amendment rights of advocacy organizations." Compl. ¶ 4. The NYCLU sought an injunction to prevent the Commission from "further inquiry . . . into [its] non-lobbying advocacy work," *id.*, as well as a preliminary and a permanent injunction "enjoining the defendant from forcing the NYCLU to report as lobbying advocacy that makes no mention of pending legislation nor exhorts any action with respect to pending legislation, including *but not limited to* its erection of the billboard outside the Crossgates Mall."[6] Compl. ¶ 41 (emphasis added). In addition, the complaint describes the Commission's investigation of Hip-Hop Summit Action Network's advocacy activities, Compl. ¶¶ 34-35, and expresses concern about the

---

[6] The NYCLU also sought a declaratory judgment that the Commission "violated the First Amendment by demanding that the NYCLU report as lobbying advocacy that makes no mention of pending legislation nor exhorts any action with respect to pending legislation." Compl. ¶ 41.

-10-

potential chilling effects of allowing the Commission to target non-lobbying advocacy work in the future, Compl. ¶¶ 30, 36, 37.  The NYCLU also asserted in its statement of allegedly undisputed facts, submitted pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Rule 56.1"), that the Commission construes the lobbying law to "require[] reporting about all forms of nonlobbying advocacy . . . by an organization also engaged in lobbying if that advocacy addresses a topic about which the organization is engaged in lobbying and the organization believes the nonlobbying advocacy will have some beneficial effect on its lobbying."

These allegations, read in the light most favorable to the NYCLU, plainly challenge conduct beyond the Commission's request for reporting with respect to the Crossgates Mall billboard.[7]  They demonstrate the existence of a live controversy between the parties regarding what constitutes reportable activity "in support of a lobbying effort," and how broadly the Commission may interpret that phrase without running afoul of the First Amendment.  We therefore conclude that the district court erred in finding that this case was moot.

## II.  Ripeness

Grandeau argues that even if we read the complaint to challenge a policy of targeting non-lobbying advocacy efforts for reporting and investigation, the alleged policy "has not been adopted by the Commission, let alone enforced against the NYCLU or anyone else."  Invoking the ripeness doctrine, Grandeau contends that this challenge is unfit for judicial review because

---

[7] Grandeau has provided no support for the assertion that pleading a facial challenge requires the allegations or request for relief to take a particular form, and we find his argument that the NYCLU's complaint is somehow deficient in this regard unavailing.  As discussed above, it is enough here that the complaint challenges an alleged Commission policy, rather than simply the application of that policy to the billboard incident.

-11-

"a court cannot coherently rule on a policy's constitutionality where, as here, it is at best unclear to what extent an agency has actually adopted a policy or how stringently the agency will enforce it."[8]  We agree.

"The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted).  A central purpose of this doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).  There are "two overlapping threshold criteria for the exercise of a federal court's jurisdiction" that fall under the term "ripeness."  *Simmonds v. INS*, 326 F.3d 351, 356-57 (2d Cir. 2003).

> Both [criteria] are concerned with whether a case has been brought prematurely,
> but they protect against prematureness in different ways and for different reasons.
> The first of these ripeness requirements has as its source the Case or Controversy
> Clause of Article III of the Constitution, and hence goes, in a fundamental way, to

---

[8]  Grandeau further argues that the NYCLU lacks standing "[f]or essentially the same reasons already described" with respect to ripeness—because the NYCLU has "not shown that any Commission policy has harmed it or threatens imminent harm."  Standing and ripeness are closely related doctrines that overlap "most notably in the shared requirement that the [plaintiff's] injury be imminent rather than conjectural or hypothetical." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006); *see also United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004) ("At the core of the ripeness doctrine is the necessity of ensur[ing] that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III of the U.S. Constitution . . . ." (internal quotation marks omitted; brackets in original)).  Because Grandeau focuses his argument on ripeness, we consider standing within the constitutional ripeness challenge.  *See Brooklyn Legal Servs.*, 462 F.3d at 225-26 (considering ripeness within standing inquiry); *see also Bronx Household of Faith v. Bd. of Educ.*, 492 F.3d 89, 111 (2d Cir. 2007) (Leval, J., concurring) (noting the overlap in ripeness and standing doctrines and focusing discussion "on those decisions which concern the ripeness of the dispute, regardless of whether they speak in terms of 'ripeness' or of 'standing'").

the existence of jurisdiction. The second is a more flexible doctrine of judicial prudence, and constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it.

These two forms of ripeness are not coextensive in purpose. Constitutional ripeness is a doctrine that, like standing, is a limitation on the power of the judiciary. It prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it. But when a court declares that a case is not prudentially ripe, it means that the case will be *better* decided later and that the parties will not have constitutional rights undermined by the delay. It does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III. . . . Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial.

*Id.* at 357 (internal citations omitted); *see also Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733 n.7 (1997) (noting that ripeness derives "both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction" (internal quotation marks omitted)).

Despite Grandeau's arguments to the contrary, there can be little dispute that the NYCLU has demonstrated the existence of a "case or controversy" over the Commission's alleged reporting requirements sufficient to establish standing and constitutional ripeness. At the time of the complaint, the NYCLU was charged with providing additional information on the expenses incurred in connection with the Crossgates Mall billboard. It argued that to allow the Commission to demand reporting on non-lobbying advocacy, including but not limited to the billboard controversy, would greatly increase its administrative burden and would infringe its First Amendment rights. These facts demonstrate a "concrete dispute affecting cognizable current concerns of the parties" sufficient to satisfy standing and constitutional ripeness.

-13-

*Ehrenfeld v. Mahfouz*, 489 F.3d 542, 546 (2d Cir. 2007) (internal quotation marks omitted).

The real issue is one of prudential ripeness: whether the alleged policy at this stage is sufficiently definite and clear to permit sound review by this Court of the NYCLU's First Amendment challenge. To determine whether a challenge to administrative action is ripe for judicial review, we proceed with a two-step inquiry, "requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149.[9]

### A.    *Fitness for Judicial Review*

"[T]he 'fitness' analysis is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." *Simmonds*, 326 F.3d at 359 (internal quotation marks omitted). For example, in *Isaacs v. Bowen*, 865 F.2d 468 (2d Cir. 1989), this Court deemed unripe a challenge to a proposed policy change in Medicare administration. We explained that plaintiffs' challenge was "directed at possibilities and proposals only, not at a concrete plan which has been formally promulgated and brought into operation." *Id.* at 477. We thus drew a distinction between pre-enforcement judicial review of "specific regulations" promulgated by the agency and judicial review of a nonfinal proposed policy. *Id.* at 478.

Similarly, in *American Savings Bank, FSB v. UBS Financial Services, Inc.*, 347 F.3d 436 (2d Cir. 2003) (per curiam), we dismissed a company's motion to enforce subpoenas served on a broker's former employees under the prudential ripeness doctrine. We held that the case was "ill-suited for judicial resolution" principally because (1) the plaintiff had not exhausted its administrative remedies; (2) judicial review would "only benefit by awaiting [the agency]'s

---

[9] The two-step inquiry is relevant for both constitutional and prudential ripeness analysis. *See Simmonds*, 326 F.3d at 359.

views" of how best to interpret its own regulations, *id.* at 440; and (3) it would be unwise to "prematurely address[] the novel issues of first impression," *id.* In contrast, "issues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *Simmonds*, 326 F.3d at 359.

The Commission policy in this case is vague at best. Other than the billboard controversy, the NYCLU purports to demonstrate the existence of a policy principally from: (1) paragraph 49 of its unopposed Rule 56.1 statement in support of summary judgment, crafted largely from statements Grandeau made in a deposition after the NYCLU filed this case;[10] (2) the Commission's investigation of nonlobbying advocacy activities relating to the Hip-Hop Summit Action Network; and (3) certain statements in the Commission's Guidelines on the Lobbying Law. None of these sources suffices to establish the existence of a Commission policy that is fit for judicial review.

First, an opposing party's failure to controvert a fact in a Rule 56.1 statement "does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). In this case, the summary judgment record itself must support the

---

[10] Paragraph 49 reads in full: "As construed by the Lobbying Commission, the lobbying law requires reporting about all forms of nonlobbying advocacy—including radio spots, public rallies, op-ed pieces, websites, organizational newsletters, letters to the editor, books, and even flyers handed out on street corners—by an organization also engaged in lobbying if that advocacy addresses a topic about which the organization is engaged in lobbying and the organization believes the nonlobbying advocacy will have some beneficial effect on its lobbying." (citations omitted).

existence of the Commission policy the NYCLU alleges. Grandeau's deposition responses to hypothetical questions about whether certain expenses would be reportable, which form the basis of the NYCLU's assertion in its Rule 56.1 statement, adopt a view of the Commission's reach that is troublingly broad, but those deposition statements do not amount to an established Commission policy. *Cf. Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 479 (2d Cir. 1999) (refusing to rely on deposition statements to establish "credible fear of enforcement" of an allegedly unconstitutional policy when statements were described as "personal opinion").[11]

Second, the Commission's investigation of the co-founders of Hip-Hop Summit Action Network principally concerned who must register and report to the Commission as a lobbyist. The plaintiffs' First Amendment claim in that case emphasized the chilling effect of the Commission's threats to subpoena, levy fines, and bring criminal charges against entities who were suspected lobbyists because of their public activities, but who had not registered as such. Here, the NYCLU's challenge concerns the extent to which non-lobbying activities may constitute a reportable expense for *registered lobbyists* when those activities are in support of a lobbying effort. While these two issues overlap to some extent, the NYCLU cannot establish the existence of a policy regarding when a lobbyist's non-lobbying activities are reportable based on the Commission's investigation into whether certain parties were lobbyists.

The NYCLU's best effort to demonstrate the alleged policy is the Commission's Guidelines, posted on its website, which state that "reportable expenses" include:

> any expenditure incurred by or reimbursed to the lobbyist for the purpose of lobbying[.] Reportable expenses include, but are not limited to the following:

---

[11] Indeed, although Grandeau's position as executive director made him the "chief administrative officer of the commission," N.Y. Legis. § 1-d(b) (McKinney 2004), nothing in the Lobbying Act gives the executive director the authority to set Commission policy.

advertising, telephone, electronic advocacy, food, beverages, tickets, entertainment, parties, receptions or similar events, advocacy rallies, consultant services, expenses for non-lobbying support staff, and courier services when said expenses are part of a lobbying effort.

New York State Commission on Public Integrity, Guidelines to New York State Lobbying Act, http://www.nyintegrity.org/law/lob/guidelines.html (last visited June 5, 2008). We recognize that this reference to electronic advocacy, advocacy rallies, receptions, and advertising creates a basis for concern that the Commission will require the NYCLU and other organizations to report non-lobbying advocacy that is only loosely related to lobbying. But the potential breadth of "reportable expenses" depends on how the Commission determines what is "part of a lobbying effort," and the Guidelines offer no indication of a Commission policy on this point. Nor was the NYCLU able to point this Court to any evidence, other than in Grandeau's deposition, of how the Commission interprets this principle.

In short, judicial review of the NYCLU's First Amendment challenge would certainly benefit from additional factual development and is in many ways contingent on future events, such as an inquiry by the Commission into activity that the NYCLU deems non-lobbying advocacy. *See Simmonds*, 326 F.3d at 359; *see also Marchi*, 173 F.3d at 478 (finding First Amendment claim unripe when the court "would be forced to guess at how [the defendant] might apply the [challenged] directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical"); *Bronx Household of Faith*, 492 F.3d at 114 (Leval, J., concurring) ("The ripeness principles elaborated in the foregoing cases bear heightened importance when, as in the present case, the potentially unripe question presented for review is a constitutional question.").

B.     *Hardship to Plaintiff of Withholding Judicial Review*

The second step in our ripeness analysis is "whether and to what extent the parties will endure hardship if decision is withheld." *Simmonds*, 326 F.3d at 359. In assessing this possibility of hardship, "we ask whether the challenged action creates a direct and immediate dilemma for the parties." *Marchi*, 173 F.3d at 478. "The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Simmonds*, 326 F.3d at 360. The hardship standard is relaxed somewhat in the First Amendment context "to avoid the chilling of protected speech," but "some credible fear of enforcement must exist." *Marchi*, 173 F.3d at 479.

This Court recently found unripe a claim by a consortium of national banks that enforcement of the Fair Housing Act against its members was preempted by the National Bank Act because the New York Attorney General had threatened but not filed an FHA action. *See Clearing House Ass'n L.L.C. v. Cuomo*, 510 F.3d 105, 124 (2d Cir. 2007). The panel held that "[b]ecause Clearing House challenges the Attorney General's right to enforce the FHA against its members, but does not contest the validity of the federal statute itself or its applicability to national banks, there is no risk that the threat of enforcement would chill conduct in which the banks could otherwise legally engage." *Id.* Moreover, the banks would not be required to violate an allegedly unconstitutional state regulation in order to challenge the FHA enforcement action nor "incur immediate expenses, make changes in their daily activity, or otherwise . . . affect their primary conduct." *Id.* (internal quotation marks omitted).

For similar reasons, the NYCLU has not demonstrated that it will suffer hardship by our withholding judicial review. Although the NYCLU must grapple with some ambiguity in preparing its regular reports, it has not shown that this lack of clarity is the cause of "present

detriment," rather than a "mere possibility of future injury" if the Commission initiates another inquiry or enforcement action. *See Simmonds*, 326 F.3d at 360. In the meantime, the NYCLU may seek an advisory opinion regarding whether a particular activity is reportable. *See* N.Y. Legis. Law § 1-d(f) (stating that the Commission has the power to "issue advisory opinions to those under its jurisdiction" and that such opinions are binding "with respect to the person to whom such opinion is rendered"). Moreover, even though the NYCLU faces the contingent possibility of an inquiry into its reporting decisions, the Lobbying Act provides penalties for statements only if they are found to be "knowingly and wilfully" false, N.Y. Legis. Law § 1-o, after investigation and a hearing at which the parties are entitled to present evidence addressing "the basis for and the amount of an assessment," *Chavis v. N.Y. Temporary State Comm'n on Lobbying*, 791 N.Y.S. 2d 707, 709 (3d Dep't 2005). Finally, the NYCLU has not alleged that our withholding of judicial review will deter it from its usual advocacy efforts, *see Clearing House*, 510 F.3d at 124, thereby threatening to chill activity protected by the First Amendment. Under these circumstances, we conclude that the NYCLU will not suffer significant hardship from delay in adjudication of the issue it presents.

Because the NYCLU's policy challenge is not fit for judicial review at this time, and because the NYCLU has not demonstrated that withholding judicial review will subject it to hardship, we hold that its First Amendment claim is not ripe for adjudication.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the defendants and dismissal of the complaint under our prudential ripeness doctrine.

-19-