ACCEPTED
15-25-00093-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/19/2025 4:25 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00093 CV**

# In the Court of Appeals for the Fifteenth Judicial District Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/19/2025 4:25:26 PM
CHRISTOPHER A. PRINE
Clerk

THE STATE OF TEXAS,

*Appellant*,

*v.*

CITY OF SAN ANTONIO; RON NIRENBERG, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF SAN ANTONIO; ERIK WALSH, IN HIS OFFICIAL CAPACITY AS CITY MANAGER OF THE CITY OF SAN ANTONIO,

*Appellees.*

On Appeal from the
407th Judicial District Court, Bexar County

## BRIEF FOR THE STATE OF TEXAS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

WILLIAM R. PETERSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General

NATHANIEL A. PLEMONS
Assistant Solicitor General
State Bar No. 24121059
Nathaniel.Plemons@oag.texas.gov

Counsel for the State of Texas

# Identity of Parties and Counsel

**Appellant:**
The State of Texas

**Appellate and Trial Counsel for Appellant:**
Ken Paxton
Brent Webster
William R. Peterson
Aaron L. Nielson (no longer employed by the Office of the Attorney General; currently employed by Kirkland & Ellis)
Nathaniel A. Plemons (lead counsel)
Sara B. Baumgardner (no longer employed by the Office of the Attorney General; currently employed by the United States Court of Appeals for the Fifth Circuit)
Ralph Molina
Austin Kinghorn
Amy Snow Hilton
Garrett Greene (no longer employed by the Office of the Attorney General; currently employed by America First Policy Institute)
Katherine Pitcher
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Nathaniel.Plemons@oag.texas.gov

**Appellees:**

City of San Antonio

Gina Ortiz Jones, in her official capacity as Mayor of the City of San Antonio

Erik Walsh, in his official capacity as City Manager of the City of San Antonio

**Appellate and Trial Counsel for Appellees:**

Kennon L. Wooten

kwooten@scottdoug.com

Lauren Ditty

lditty@scottdoug.com

Scott, Douglass

& McConnico LLP

303 Colorado Street, Suite 2400

Austin, Texas 78701-2589

Phone: (512) 495-6300

Fax: (512) 495-6399

Deborah Lynne Klein

Deputy City Attorney

deborah.klein@sanantonio.gov

City of San Antonio

Office of the City Attorney

Litigation Division

203 S. St. Mary's St., 2nd Floor

San Antonio, Texas 78205

Phone: (210) 207-8940

Fax: (210) 207-4357

# Table of Contents

Page

Identity of Parties and Counsel ..................................................................i

Index of Authorities ..................................................................................v

Statement of the Case ..............................................................................xi

Statement Regarding Oral Argument .......................................................xi

Issues Presented .....................................................................................xii

Introduction.............................................................................................. 1

Statement of Facts .....................................................................................2

    I.    Factual Background .........................................................................2

        A.  First Request for Proposals: "reproductive justice" services generally.................................................................................3

        B.  Second request for proposals: abortion-travel services specifically ...............................................................................5

              1.    The City immediately turns its attention to funding abortion travel. ..........................................................5

              2.    The City fast-tracks its plan to disburse abortion-travel funds. .....................................................................9

    II.  Procedural Background....................................................................11

Summary of the Argument....................................................................... 13

Standard of Review ................................................................................. 14

Argument................................................................................................. 14

    I.    The City's Attempt to Fund Travel for Out-of-State Abortions Violates the Texas Constitution's Gift Clause. ........................ 15

        A.  Taxpayer-funded abortion travel does not benefit the public............. 15

        B.  Facilitating ending unborn children's lives is antithetical to "legitimate public purposes." ........................................ 17

              1.    The abortion travel payments would serve a *private*, not public, purpose. ......................................... 18

              2.    Ending unborn life is not a legitimate public purpose.................. 18

              3.    Abortion does not advance public health. ...................................20

    C.   The City's plan does not contemplate public control over the funds. .......................................................................................... 21

  II.  Delaying Judicial Review Would Cause the State Great Hardship by Allowing the City to Violate the Gift Clause. ......................................22

    A.   The State will suffer hardship if the City improperly disburses taxpayer dollars. ................................................................22

    B.   The importance of the State's interest in enforcing the Texas Constitution weighs in favor of jurisdiction. .....................................27

  III.  The Gift Clause Violation is Fit for Review Because the City's Illegal Activity is "Likely to Occur." ........................................................27

Prayer ............................................................................................................... 33

Certificate of Compliance ................................................................................ 33

# Index of Authorities

Page(s)

**Cases:**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ...................................................................................... 14

*In re Abbott*,
628 S.W.3d 288 (Tex. 2021) ......................................................................... 25

*Ackers v. Comerica Bank & Tr., N.A., Tr. of Larry Ackers Generation Skipping Tr.*,
654 S.W.3d 750 (Tex. 2022) ......................................................................... 31

*Am. Forest & Paper Ass'n v. EPA*,
137 F.3d 291 (5th Cir. 1998) ........................................................................ 14

*Avery v. LPP Mortgage, Ltd.*,
No. 01-14-01007-CV, 2015 WL 6550774 (Tex. App.—Houston
[1st Dist.] Oct. 29, 2015, no pet.) .................................................................2

*Blanchette v. Conn. Gen. Ins. Corps.*,
419 U.S. 102 (1974) ...................................................................................... 31

*Borgelt v. Austin Firefighters Ass'n, IAFF Loc. 975*,
692 S.W.3d 288 (Tex. 2024) ..................................................................*passim*

*Cantwell v. Sterling*,
788 F.3d 507 (5th Cir. 2015) .........................................................................2

*Chevron U.S.A., Inc. v. Traillour Oil Co.*,
987 F.2d 1138 (5th Cir. 1993) ...................................................................... 31

*Choice Inc. of Tex. v. Greenstein*,
691 F.3d 710 (5th Cir. 2012) ................................................................. 24, 28

*City of Elsa v. M.A.L.*,
226 S.W.3d 390 (Tex. 2007) ......................................................................... 28

*Coleman v. Dretke*,
409 F.3d 665 (5th Cir. 2005) .........................................................................2

*Dall. Area Rapid Transit v. Agent Sys., Inc.*,
No. 02-12-00517-CV, 2014 WL 6686331 (Tex. App.—Fort Worth
Nov. 26, 2014, pet. denied) ...........................................................................2

*Davis v. City of Lubbock*,
326 S.W.2d 699 (Tex. 1959) ......................................................................... 17

*Davis v. City of Taylor*,
67 S.W.2d 1033 (Tex. 1934) ......................................................................... 17

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ......................................................................*passim*

*Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*,
  438 U.S. 59 (1978)....................................................................................22

*E.P.A. v. Nat'l Crushed Stone Ass'n*,
  449 U.S. 64 (1980) ...................................................................................27

*Edgewood Indep. Sch. Dist. v. Meno*,
  917 S.W.2d 717 (Tex. 1995) ................................................................. 15

*Fitzgerald v. Advanced Spine Fixation Sys., Inc.*,
  996 S.W.2d 864 (Tex. 1999) ..................................................................24

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) .................................................................................20

*Griggs Canning Co. v. Josey*,
  164 S.W.2d 835 (Tex. 1942) ................................................................. 19

*Heckman v. Williamson County*,
  369 S.W.3d 137 (Tex. 2012) ................................................................. 31

*Henderson v. Blalock*,
  No. 13-16-00175-CV, 2017 WL 3304451 (Tex. App.—Corpus
  Christi–Edinburg Aug. 3, 2017, no pet.) ..............................................2

*In re J.W.*,
  645 S.W.3d 726 (Tex. 2022) (Boyd, J., dissenting)............................ 19

*Jacob E. Decker & Sons v. Capps*,
  164 S.W.2d 828 (Tex. 1942)................................................................. 19

*Lazarides v. Farris*,
  367 S.W.3d 788 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ....................2

*Lilith Fund for Reprod. Equity v. Dickson*,
  662 S.W.3d 355 (Tex. 2023) (Devine, J., concurring)................................18, 19

*Mayhew v. Town of Sunnyvale*,
  964 S.W.2d 922 (Tex. 1998) ................................................................. 14

*Noe v. Velasco*,
  690 S.W.3d 1 (Tex. 2024) ...................................................................... 19

*State ex rel. Off. of Att'y Gen. of Tex. v. City of San Marcos*,
  714 S.W.3d 224 (Tex. App.—15th Dist. 2025, pet. denied)............................14

*Patrizi v. McAninch*,
  269 S.W.2d 343 (Tex. 1954) .................................................................. 16

*Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*,
   971 S.W.2d 439 (Tex. 1998) ....................................................... 14, 27
*Pearson v. Holder*,
   624 F.3d 682 (5th Cir. 2010) ...................................................... 28, 31
*Perry v. Del Rio*,
   66 S.W.3d 239 (Tex. 2001) ..........................................................*passim*
*Rolling Plains Groundwater Conservation Dist. v. City of Aspermont*,
   353 S.W.3d 756 (Tex. 2011)...............................................................28
*Simmonds v. INS*,
   326 F.3d 351 (2d Cir. 2003) ..............................................................28
*State v. Hollins*,
   620 S.W.3d 400 (Tex. 2020)................................................ 22, 27, 28
*In re State*,
   711 S.W.3d 641 (Tex. 2024) .........................................................*passim*
*Stenberg v. Carhart*,
   530 U.S. 914 (2000) (Kennedy, J., dissenting) ................................20
*Tex. Dep't. of Parks & Wildlife v. Miranda*,
   133 S.W.3d 217 (Tex. 2004) ..............................................................14
*In re Tex. Educ. Agency*,
   619 S.W.3d 679 (Tex. 2021) ..............................................................29
*Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*,
   74 S.W.3d 377 (Tex. 2002) ................................................................15
*In re Tex. Nat. Res. Conservation Comm'n*,
   85 S.W.3d 201 (Tex. 2002) ................................................................26
*Texas v. United States*,
   497 F.3d 491 (5th Cir. 2007) .............................................................14
*W.A. Morgan & Bros. v. Missouri, K. & T. Ry. Co. of Tex.*,
   193 S.W. 134 (Tex. 1917)...................................................................19

**Constitutional Provisions, Statutes, and Rules:**
Tex. Const.:
   art. III, § 52(a) ..................................................................... xi, 11, 15
   art. VIII, § 6......................................................................................23
14 Tex. Jur. 3d Contracts § 127 ...........................................................16
Tex. Civ. Prac. & Rem. Code:
   § 51.014(a) .........................................................................................26
   § 51.014(a)(4) ....................................................................................26

Tex. Gov't Code:
§ 21.001 ..................................................................................................28-29
§ 316.071(a) ............................................................................................. 23
§ 551.043................................................................................................. 26
§ 2273.001(4)-(5) ..................................................................................... 12
§ 2273.004(a)........................................................................................... 12
§ 2273.0031.............................................................................................. 16
§ 2273.0031(a) ......................................................................................... 12

Tex. Health & Safety Code:
ch. 170A ..............................................................................................16, 19
§§ 171.201-.212 ...................................................................................... 19

Tex. R. App. P. 21(b) .............................................................................. 25

Tex. R. Civ. P.:
21(b) ........................................................................................................ 25
680........................................................................................................... 25

Tex. S.B. 730, 89th Leg., R.S. (2025) ...................................................... 7

**Other Authorities:**

Act of May 28, 2025, 89th Leg., R.S., S.B. 33, § 6............................. 2, 12

*Agenda: Community Health Committee*, City of S.A.,
    https://perma.cc/Q93L-979V..............................................................6

*Agenda Memorandum*, City of S.A.,
    https://perma.cc/ES3E-KSVR.............................................................5

Appellant's Emergency Motion for Temporary Order at 4-7,
    *State v. Callanen*, No. 15-24-00099-CV (Tex. App.-15th Dist.
    Sept. 16, 2024).................................................................................. 25

April 3 Meeting Minutes at 5, City of S.A.,
    https://perma.cc/ZKQ5-E3BW (last visited July 28, 2025)................8, 9, 10, 29

Bexar Cnty. Loc. R. 6C, available at
    www.bexar.org/DocumentCenter/View/40208/Bexar-County-
    Civil-District-Court-Local-Rules-2024 ........................................... 25

Brief for American Association of Pro-life Obstetricians and
    Gynecologists in Support of Petitioners at 3-4, *Dobbs*, 597 U.S. 215
    (No. 19-1392) ....................................................................................20

Brief for Appellees at 6-12, *State v. Harris County*, No. 15-24-00061-
    CV (Tex. App.-15th Dist. July 8, 2024)............................................23

13A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3532.1 (2d ed. 1984) .........................................................15, 27, 28

City of San Antonio, *San Antonio City Council A Session*, SASpeakUp, at 2:41:30-2:46:00 (Apr. 3, 2025, 11:00 a.m.), https://saspeakup.com/HU81151 ................................................................. 9, 21

February 28 Minutes: Community Health Committee, City of S.A., https://perma.cc/PGZ3-MVX6................................................................. 6, 7

*History: SB 33*, Tex. Legislature Online, https://perma.cc/86WN-HYYK .............................................................................................................. 12

Human Life Protection Act of 2021, 87th Leg., R.S., ch. 800, § 3(1), 2021 Tex. Gen. Laws 1886 ............................................................... 10

*Initial Score Matrix*, City of S.A., https://perma.cc/76VZ-BVE7 ...........................4

January 23 Minutes: Community Health Committee, City of S.A., https://perma.cc/FU34-CBCD................................................................6

January 23 Presentation, City of S.A. at 2, https://perma.cc/5Z2J-C3KQ..........................................................................6

*Lt. Gov. Dan Patrick Announces Second Round of Top 40 Priority Bills for the 2025 Legislative Session*, Lieutenant Governor of Tex. (Mar. 13, 2025), https://perma.cc/D2XG-QJMG...........................................................................8

Mary Elise Cosgray, *Texas Senate Bill Filed to Ban Taxpayer-Funded Expenditures on Abortions*, The Texan (Feb. 17, 2025), https://perma.cc/6F9Y-STS9 .........................................................................7

November 21 Meeting Minutes at 13, City of S.A., https://perma.cc/NC5V-FPHD...............................................................*passim*

October 16 Meeting Minutes at 4, City of S.A., https://perma.cc/XJA2-8MHR................................................................2, 4

Order denying Pet., *In re San Antonio*, No. 25-0593 (Tex. September 5, 2025) ............................................................................ 12

Pet. for Writ of Mandamus, *In re City of San Antonio*, No. 25-0593 (Tex. July 9, 2025) ............................................................*passim*

*Request for Proposals - Reproductive Justice Fund - Reproductive Health Care*, City of S.A. (June 24, 2024), https://perma.cc/DM4V-947Z ("*First Request for Proposals*") .........................................................3, 4

*Request for Proposals - Reproductive Justice Fund Downstream Services*, City of S.A. (Apr. 14, 2025), (emphasis added), https://perma.cc/SE77-T8YX ("*Second Request for Proposals*") ..................................... 10, 18, 23, 30

Restatement (Second) of Contracts § 71 cmt. (e) (1981) ........................................ 16

Senate Comm. On State Affairs, Bill Analysis, Tex. SB 33, 89th Leg.,
    R.S. (2025), https://perma.cc/6KVG-XVEB ...................................................8

## Statement of the Case

*Nature of the Case*: The State sued the City of San Antonio, its Mayor, and its City Manager (collectively, "the City") for ultra vires conduct under the Uniform Declaratory Judgments Act. CR.8-10. The State sought declarations that the City's plan to spend taxpayer dollars on travel for out-of-state abortions violates the Texas Constitution's Gift Clause. CR.8-10; *see* Tex. Const. art. III, § 52(a).

*Course of Proceedings*: The City filed a plea to the jurisdiction, asserting that the State's claim was not ripe. CR.69-86. The district court granted. CR.542.

*Trial Court*: 407th Judicial District Court, Bexar County
The Honorable Antonia Arteaga.

*Trial Court Disposition*: The district court granted the City's plea to the jurisdiction and rendered final judgment dismissing the suit. CR.542.

## Statement Regarding Oral Argument

The State does not believe oral argument is necessary in this case. However, should this Court set this case for oral argument, the State requests that it be permitted to participate.

# ISSUES PRESENTED

1.  Does the City's plan to disburse taxpayer dollars to fund travel for out-of-state abortions violate the Texas Constitution's Gift Clause?

2.  Is that constitutional violation "likely to occur" such that the case is ripe?

# INTRODUCTION

To circumvent Texas's laws protecting unborn life, the City devised a plan to use taxpayer funds to pay for travel for out-of-state abortions—without receiving any consideration in return for the funds, without benefiting the public, and without contemplating retaining public control over the funds. That plan violates the Gift Clause's prohibition on "dol[ing] out public funds" on a gratuitous basis, *see In re State*, 711 S.W.3d 641, 646 (Tex. 2024). The district court refused to reach that issue because it concluded that the City's planned disbursements were not likely to occur and, as a result, the case was unripe. That was error.

The City's plan to fund out-of-state abortion travel is already well underway. After expediting a proposal to spend $100,000 on certain "reproductive justice" services, the City Council passed an ordinance approving an expedited procurement process to contract for those services. Throughout every step of the process, the only "reproductive justice" service that City has ever identified is out-of-state abortion travel. The City has now completed its procurement process, and its only step left before disbursing the funds is to execute the contracts—which the City indicates that it will do soon. For example, the City told the Supreme Court that the sole reason it had *not* executed the contracts is because it mistakenly believes that this Court's order prohibits it from executing the contracts, rather than just from disbursing the funds. Pet. for Writ of Mandamus at 15, *In re City of San Antonio*, No. 25-0593 (Tex. July 9, 2025). And SB 33[1] has yet to moot this case because the City believes that,

---

[1] Act of May 28, 2025, 89th Leg., R.S., S.B. 33, § 6 ("SB 33").

absent this Court's order, it could disburse the funds on or before September 30. *Id.* at 17-18. The injury to the public treasury is therefore "likely to occur" and this Court should reverse.

**STATEMENT OF FACTS**

## I.  Factual Background

In 2023, the City Council created the "Reproductive Justice Fund" and allocated $500,000 to it for the 2024 fiscal year. CR.70. On its face, the Fund was designed to promote "reproductive justice" through "reproductive and sexual healthcare services." *See* CR.89, 285. But as multiple City councilmembers admitted, the Fund "was set up from the beginning to fund abortion access" and specifically "anticipated funding travel for abortions." November 21 Meeting Minutes at 13, City of S.A., https://perma.cc/NC5V-FPHD.[2]  That was because the Fund was really "a response to the *Dobbs* Decision and Texas' subsequent abortion ban." October 16 Meeting Minutes at 4, City of S.A., https://perma.cc/XJA2-8MHR. And as the City formally admitted, it borrowed the term "reproductive justice" from "the National Black Women's Reproductive Justice Agenda," which defines the term to include "the right to not have children." *Request for Proposals – Reproductive*

---

[2] The Court may take judicial notice of information on government websites. *See e.g.*, *Cantwell v. Sterling*, 788 F.3d 507, 509 (5th Cir. 2015) (per curiam) (citing *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005); *Lazarides v. Farris*, 367 S.W.3d 788, 799 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Avery v. LPP Mortgage, Ltd.*, No. 01-14-01007-CV, 2015 WL 6550774, at *3 (Tex. App.—Houston [1st Dist.] Oct. 29, 2015, no pet.); *Dall. Area Rapid Transit v. Agent Sys., Inc.*, No. 02-12-00517-CV, 2014 WL 6686331, at *16 (Tex. App.—Fort Worth Nov. 26, 2014, pet. denied); *Henderson v. Blalock*, No. 13-16-00175-CV, 2017 WL 3304451, at *2 n.5 (Tex. App.—Corpus Christi–Edinburg Aug. 3, 2017, no pet.).

*Justice Fund – Reproductive Health Care*, City of S.A. (June 24, 2024), https://perma.cc/DM4V-947Z ("*First Request for Proposals*").

### A. First Request for Proposals: "reproductive justice" services generally

**1.** In June 2024 the City's health department, Metropolitan Health District ("Metro Health") issued a request for proposals inviting organizations to apply for Fund monies that the organizations could then spend on "reproductive justice" services. *See id.*; CR.19. The request specifically sought proposals for three types of services:

(1) "upstream" services—*i.e.*, "policy approaches that have potential to affect large populations" such as "education, trainings, collaborations and outreach;"

(2) "downstream" services—*i.e.*, "direct services" for "individual needs" that include abortion travel; and

(3) "midstream" services—*i.e.*, services that "fall somewhere in between" the first two but that, like their "upstream" counterparts, focus on "education, trainings, collaborations and outreach." CR.19.

The request also made "transportation to abortion care" an "optional" "downstream" service that organizations *could*, but need not necessarily, propose. CR.29. In fact, the request did not even list transportation services as an applicable category of services sought. *First Request for Proposals*, *supra*. Perhaps because of that, only two of the ten organizations that responded included abortion-travel services in their

3

proposals and, even then, only did so "as an element of a broader package." *See* CR.21-22, 29; *Initial Score Matrix*, City of S.A., https://perma.cc/76VZ-BVE7.

**2.** In October 2024, after reviewing the ten proposals, Metro Health presented its report to the City Council. October 16 Meeting Minutes, *supra*. Metro Health recommended that the City authorize agreements with four of the organizations that had submitted proposals, which would cost the City almost the entire $500,000 Fund. *Id.*; *see* CR.19-20. Importantly, none of those four organizations proposed abortion-travel services. CR.29. Instead, they proposed—and ultimately received funding for—"doula training, high school education on sexually transmitted infections ("STIs"), STI testing, contraception including long-acting reversible contraception, workshops on healthy pregnancies and sexual and reproductive health, and wraparound prenatal care services including doula, acupuncture and mental health services." CR.19-20, 29.

During Metro Health's presentation, much of the City Council's discussion centered around abortion travel, with at least one councilmember expressing "disappointment that none of the [four recommended organizations] proposed assistance with travel for an out-of-state abortion." October 16 Meeting Minutes, *supra*, at 2-3. That councilmember explained that support for "travel out of state was an important component of the Reproductive Justice Fund" given that the Fund "was a response to the *Dobbs* Decision and Texas' subsequent abortion ban." *Id.* at 4. And the City's mayor recommended issuing a request for proposals "specifically for th[e] purpose [of] . . . funding of travel for out-of-town abortions . . . so the City would receive proposals for that service." *Id.*

4

**3.** From there, the City Council advanced the four recommended proposals to a final vote, which it held on November 21, 2024. CR.19-20; November 21 Meeting Minutes, *supra*, at 14. Although none of the four proposals included abortion travel, multiple members of the public nonetheless testified before the City Council on the day of the vote, urging that "the funding not to be used for abortion or travel to other states for women to seek an abortion." November 21 Meeting Minutes, *supra*, at 13.

After further discussions of abortion and abortion travel, the City Council approved the four recommended agreements by a 9-0 vote (with one councilmember absent and another abstaining). *Id.* at 14. But the fact that nearly the entire $500,000 Fund was now spent did not end the City's talks of funding abortion travel.

**B. Second request for proposals: abortion-travel services specifically**

**1. The City immediately turns its attention to funding abortion travel.**

**a.** The very next day, a councilmember sent a memo to the City Council's Community Health Committee, composed of five councilmembers. CR.30; *see Agenda Memorandum*, City of S.A., https://perma.cc/ES3E-KSVR (noting members of the Committee). The memo recommended "adding at least $100,000 in funding to provide key downstream services that are not addressed by the existing vendors." *Agenda Memorandum* at 2. Those "key" services were out-of-state abortion-travel services. *See* CR.29-30 (identifying only abortion travel as a "downstream service[] that w[as] not met through the already awarded $500,000"). The memo was co-signed by three of the Committee's members, including the chair. *See* CR.30 (noting that the councilmembers for districts 1, 2, 3, and 5 co-signed the memo); *Agenda:*

5

*Community Health Committee*, City of S.A., https://perma.cc/Q93L-979V (noting that those councilmembers are on the Committee).

**b.**    Unsurprisingly, the Committee moved forward with the recommendation. Although it is unclear where in the City's budget the Committee expected to find $100,000, *see* January 23 Minutes: Community Health Committee, City of S.A., https://perma.cc/FU34-CBCD (discussing possible sources of funding); February 28 Minutes: Community Health Committee, City of S.A., https://perma.cc/PGZ3-MVX6 (same), the Committee held two meetings to discuss its plans for funding abortion travel.

At the *first* meeting in January 2025, Metro Health briefed the Committee on the recommendation and explained how the request-for-proposal process would work—including that, to expedite the process, Metro Health would only accept proposals from the original ten organizations that submitted proposals for the $500,000. CR.30. Metro Health emphasized that the none of the last four agreements funded abortion travel. January 23 Minutes: Community Health Committee, City of S.A., *supra*. And it provided examples of how much money other major cities across the country spend on "abortion access;" ranging from $200,000 (Portland) to $2.5 million (Chicago).  January 23 Presentation, City of S.A. at 2, https://perma.cc/5Z2J-C3KQ.

Then at its *second* meeting in February 2025, the Committee put the recommendation to a vote. *See* CR.89. But before voting, the Committee briefly discussed a bill that Senator Donna Campbell (one of San Antonio's state senators) recently filed that would prohibit taxpayer dollars from being used to facilitate abortion. February

28 Minutes: Community Health Committee, *supra*, at 9, City of S.A.; *see* Tex. S.B. 730, 89th Leg., R.S. (2025); Mary Elise Cosgray, *Texas Senate Bill Filed to Ban Taxpayer-Funded Expenditures on Abortions*, The Texan (Feb. 17, 2025), https://perma.cc/6F9Y-STS9. That bill, identical to what became SB 33, specifically addressed "cities like . . . San Antonio" that "misuse taxpayer funds in ways that undermine our state's pro-life policies." Cosgray, *supra*.

But after the City Attorney's office informed the Committee that the bill had not passed yet, February 28 Minutes: Community Health Committee, *supra*, at 9, the Committee marched on, voting to advance to the full City Counsel the recommendation that the City spend "an additional $100,000 to fund downstream services that were not met through the already awarded funds." CR.20, 286. In so doing, multiple councilmembers proclaimed that they "fully supported allocating $100,000 for travel for abortion care," that anyone who opposed the expenditure "had a level of privilege that allowed them to get out of state treatment," and that the City should "not be afraid" of being sued if it funded abortion travel. February 28 Minutes: Community Health Committee, *supra* at 9.

**c.** Metro Health then held an interest meeting with the original ten organizations to determine whether they wanted to submit new proposals for the $100,000. CR.20, 89. After the meeting, Metro Health sent the organizations a form that asked them two questions. CR.20, 32, 90. *First*, would the organizations be interested in additional funds for "downstream" services in general (but not for "upstream" or "midstream" services)? CR.20, 32, 90. Nine of the ten organizations said yes.

7

CR.20, 90. *Second*, would the organizations be interested in additional funds specifically for travel for out-of-state abortions? CR.20, 32, 90. Three of the ten organizations said yes, and a fourth said it would be interested "if the City were to provide legal protection for the organization." CR.20, 90. Based on that information, Metro Health asked the City Council to "authorize an expedited procurement" of "downstream services" that "may include out-of-state travel" for abortions. CR.20.

**d.**    On April 3, the full City Council met to vote on the recommendation. CR.19-20. By that point, Senator Campbell filed SB 33—a priority bill for the Lieutenant Governor—to "stop[] taxpayer-funded abortion travel." *See Lt. Gov. Dan Patrick Announces Second Round of Top 40 Priority Bills for the 2025 Legislative Session*, Lieutenant Governor of Tex. (Mar. 13, 2025), https://perma.cc/D2XG-QJMG. As Senator Campbell explained, SB 33 would end the "blatant misuse of Texan taxpayer funds" that "the San Antonio city council has repeatedly attempted" to commit through "giving money to entities that aid or abet abortions." Senate Comm. On State Affairs, Bill Analysis, Tex. SB 33, 89th Leg., R.S. (2025), https://perma.cc/6KVG-XVEB.

The City Council, aware of the Legislature's attempt to stop its plans, discussed whether it would be possible to spend the money before SB 33, if passed, would go into effect. April 3 Meeting Minutes at 5, City of S.A., https://perma.cc/ZKQ5-E3BW (last visited July 28, 2025). Metro Health informed the City Council that it "would go through the expedited procurement" so that "the funding would be expected to be under contract by June 2025"—well before September 1 when SB 33 would take effect. *Id.* And although the City Manager noted that the City typically

8

structures its service contracts so that the City reimburses, rather than pays up-front, for services, he suggested that (even under a reimbursement scheme) funds could be disbursed on a rolling basis (as abortion traveling happened). *Id.*; City of San Antonio, *San Antonio City Council A Session*, SASpeakUp, at 2:41:30-2:46:00 (Apr. 3, 2025, 11:00 a.m.), https://saspeakup.com/HU81151.

Before the City Council voted, it heard public comments. April 3 Meeting Minutes, *supra*, at 2. Although those comments were almost equally divided for and against taxpayer-funded abortion travel, *see id.*, those numbers were not representative of all San Antonians' views. As one councilmember explained at another meeting, "his office sent an email to 10,000 [of his district's] residents and 68% stated that they did *not* want the City to fund travel for out of state abortions, while 25% indicated that they supported funding for travel." November 21 Meeting Minutes, *supra*, at 13 (emphasis added).

After concluding its discussion and public-comment period, the City Council passed an ordinance approving an expedited procurement process to find services on which to spend the $100,000. CR.89-91; April 3 Meeting Minutes, *supra*, at 5. Multiple sections of the ordinance specifically highlighted out-of-state travel to obtain abortions. CR.89-90.

### 2. The City fast-tracks its plan to disburse abortion-travel funds.

To procure those services, Metro Health issued a new request for proposals. CR.259. That request expressly sought "proposals to address 'downstream' *gaps* in San Antonio's reproductive health landscape, with particular attention to *abortion*

*transportation* and support." *Request for Proposals – Reproductive Justice Fund Down-stream Services*, City of S.A. (Apr. 14, 2025), (emphasis added), https://perma.cc/SE77-T8YX ("*Second Request for Proposals*"). The request explained that such "support" was important because "[o]ne in eight U.S. pregnancies ended in abortion before the *Dobbs* decision" but fewer had done so since then. *Id.* (emphasis added). The proposal highlighted the number of abortions in Texas, complaining that it had dropped by 66% the year that Texas's Human Life Protection Act went into effect after the *Dobbs* decision. *See id.*; Human Life Protection Act of 2021, 87th Leg., R.S., ch. 800, § 3(1), 2021 Tex. Gen. Laws 1886, 1887.

Metro Health issued that request in mid-April 2025 exclusively to the ten organizations that previously submitted proposals (the same organizations that the City invited to its interest meeting). CR.27, 73, 259; *Second Request for Proposals*, *supra*. Outside organizations could not apply for the $100,000. *See* CR.27, 73, 259; *Second Request for Proposals*, *supra*. The City allotted thirty days for submissions, so the application window closed in mid-May. CR.30, 73, 259; *Second Request for Proposals*, *supra*.

Metro Health expected that it would take another thirty days to evaluate and score the submissions, CR.30, so that Metro Health could release the results by "[m]id-June" and the City Council could approve the contracts at the "[e]nd of June," CR.35. The City has been nothing but consistent about that timeline. The director of Metro Health told the City Council in early April that "the funding would be expected to be under contract by June 2025." April 3 Meeting Minutes, *supra*, at

10

5. And he confirmed that that timeline in an affidavit sworn to in late April, explaining that contracts "will likely be executed" and implementation "will likely occur" in "the summer of 2025." CR.526.

The City then stated in a pleading to the trial court that (1) Metro Health would finish evaluating and scoring submissions in "mid-June 2025," (2) the City Council would vote to execute contracts at "the end of June," and (3) implementation of those contracts would occur in "the [s]ummer of 2025." CR.73-74. And the City told the Supreme Court on July 9 that the City Council "would have [already] voted to approve contracts" for the planned services "[b]ut for" this Court's order. Pet. for Writ of Mandamus at 15.

## II. Procedural Background

In response to the City's ultra vires attempt to fund abortion travel, the State sued the City, the Mayor, and the City Manager. CR.5-37. The State did not need to wait until SB 33 went into effect to do so because the City's scheme already violated existing law: the Gift Clause of the Texas Constitution. *See* Tex. Const. art. III, § 52(a); CR.5-37.

The State sought a declaration that the City's plan to spend "taxpayer money on support for out-of-state abortions, including travel for out-of-state abortions" would violate the Gift Clause. CR.10, 13. And the State sought temporary and permanent injunctive relief prohibiting the City from (1) "spending taxpayer money on support for out-of-state abortions, including travel for" abortions or (2) "continuing to implement the allocation and expenditure of taxpayer dollars for support for

11

out-of-state abortions, including out-of-state travel." CR.13. As part of that relief, the State requested a temporary restraining order. CR.10.

In response, the City filed a plea to the jurisdiction, asserting that the State's Gift Clause claim was not yet ripe. CR.69-86. The trial court granted the City's plea and entered final judgment dismissing the suit. CR.542.

Soon after the State filed its notice of appeal, the Legislature passed SB 33. *See History: SB 33*, Tex. Legislature Online, https://perma.cc/86WN-HYYK. On June 20, the Governor signed SB 33 into law; and on September 1, the law went into effect. *Id.*; S.B. 33, § 6. As a result, State law now prohibits governmental entities (including cities) from spending money on "logistical support for the express purpose of assisting a woman with procuring an abortion or the services of an abortion provider," including "travel or any form of transportation to or from an abortion provider." Tex. Gov't Code § 2273.0031(a); *see id.* § 2273.001(4)-(5). And State law authorizes the Attorney General to bring civil suits to enforce the provisions of SB 33. *Id.* § 2273.004(a).

On appeal, the State moved for temporary relief enjoining the City from disbursing the funds at issue during the pendency of the appeal. Appellant's Mot. for Temporary Relief at 1-3, 23. This Court granted that relief, Order at 12, and the City petitioned the Supreme Court for a writ of mandamus directing this Court to vacate its order. Pet. for Writ of Mandamus at 14. In its mandamus petition, the City identified September 30, when its fiscal year ends, as its deadline for disbursing the funds. *Id.* at 17-18. The Supreme Court denied that petition on September 5. Order denying Pet., *In re San Antonio*, No. 25-0593 (Tex. September 5, 2025).

12

## Summary of the Argument

The Texas Constitution's Gift Clause prohibits the City from granting public funds to private parties unless (1) the City receives a *public benefit* in return, (2) the funds serve a *public purpose*, and (3) the City retains *public control* over the funds. *Borgelt v. Austin Firefighters Ass'n, IAFF Loc. 975*, 692 S.W.3d 288, 301 (Tex. 2024). The City's plan to use taxpayer dollars to fund travel for out-of-state abortions fails each requirement: The plan is unsupported by consideration, ending unborn children's lives is not a public purpose, and the plan does not contemplate that the City will retain control over the funds.

Delaying judicial review would cause the State great hardship by placing it at imminent risk of sustaining this constitutional injury. Because a Gift Clause violation occurs at the moment funds are disbursed, *see In re State*, 711 S.W.3d at 648, the State will sustain an irreparable sovereign injury if the City approves the abortion-service contracts and disburses the funds before the State can obtain injunctive relief. And because of the City's stated desire to disburse the funds before its fiscal year ends on September 30, the period between when the City approves the contracts and when it transfers the funds out of the public treasury will likely be too short a window for the State to obtain injunctive relief.

The City continues to indicate that it plans to go through with the contract approval and disbursements "[b]ut for" this Court's order pending appeal. Given the significant hardship the State faces, the injury is sufficiently "likely to occur" that

13

the suit is ripe for review. And SB 33 has yet to moot this case because the City believes that, absent this Court's order, it may disburse the funds on or before September 30 and thus a live controversy continues between the parties.

## Standard of Review

A plea to the jurisdiction challenging ripeness "raises a question of law, which is reviewed de novo." *State ex rel. Off. of Att'y Gen. of Tex. v. City of San Marcos*, 714 S.W.3d 224, 233 (Tex. App.—15th Dist. 2025, pet. denied); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). In that review, the court construes the pleadings liberally in favor of finding jurisdiction and accepts all of the State's allegations as true. *City of San Marcos*, 714 S.W.3d at 234 (citing *Tex. Dep't. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)).

## Argument

Ripeness, "like standing, emphasizes the need for a *concrete injury* for a justiciable claim to be presented." *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998) (citation omitted) (emphasis added). In determining ripeness, a court examines (1) "the hardship to the parties of withholding court consideration" and (2) "the fitness of the issues for judicial decision." *Perry v. Del Rio*, 66 S.W.3d 239, 250 (Tex. 2001) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). These prongs must be balanced. *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007) (citing *Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 296 (5th Cir. 1998)). That is because the ripeness analysis follows "a functional approach that directly weighs the importance of the interest advanced; the extent of the injury or

risk; [and] the difficulty of deciding the substantive issues and the allied need for specific factual illumination." *Perry*, 66 S.W.3d at 251-52 (quoting 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3532.1 (2d ed. 1984)). The Court should hold that this case is ripe because the State has important interests in protecting taxpayer dollars from misuse and preventing constitutional violations.

## I.  The City's Attempt to Fund Travel for Out-of-State Abortions Violates the Texas Constitution's Gift Clause.

The Texas Constitution contains several Gift Clauses that prohibit the government from "dol[ing] out public funds" on a gratuitous basis. *In re State*, 711 S.W.3d at 646. The Gift Clause at issue here prohibits the Legislature from authorizing a city to gratuitously grant public money to private parties. Tex. Const. art. III, § 52(a); *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 386 (Tex. 2002). Any such grant is impermissible unless (1) the city receives a *public benefit* in return, (2) the funds serve a *public purpose*, and (3) the city retains *public control* over the funds. *Borgelt*, 692 S.W.3d at 301. That is, disbursements must satisfy each requirement to survive constitutional scrutiny. *Id.* The City's abortion-travel disbursements do not satisfy even one requirement.

### A.  Taxpayer-funded abortion travel does not benefit the public.

The City does not receive a "clear public benefit . . . in return" for the abortion-travel funds. *See Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 740 (Tex. 1995). It is blackletter law that a government must receive sufficient consideration in return for public funds. *Tex. Mun. League*, 74 S.W.3d at 384. But the City has never suggested that organizations will give any consideration in exchange for the funds. And

15

the abortion travel itself is not consideration in the Gift Clause context because it does not confer a benefit on the *public*. *See infra* p. 17-18.

Although a benefit to a third party may certainly constitute consideration to support a *private* contract, *see, e.g.*, Restatement (Second) of Contracts § 71 cmt. (e) (1981); 14 Tex. Jur. 3d Contracts § 127, the Gift Clause requires a "clear *public* benefit" to support a *public* contract. So while any money that the City gives away would presumably benefit *someone* (perhaps, for example, out-of-state abortionists whose pockets would be lined at the cost of unborn lives), that someone would not be the public. Given that abortion does not promote public health, *see infra* pp. 18-20, and that the City does not receive any other collateral benefit from the travel, abortion travel does not constitute valid consideration.

And even if the City did receive some other benefit, if even a *single* form of consideration supporting a contract is unlawful, then the whole contract "is void" for lack of consideration. *Patrizi v. McAninch*, 269 S.W.2d 343, 348 (Tex. 1954) ("It is obvious that there is ample valid consideration to support the promise sued on; yet, if, to the abundance of valid consideration, there has been added a leaven of what is illegal, the whole contract is tainted." (citation omitted)). Here, the chief end of the City's plan—funding travel to end unborn children's lives—is illegal. *See* Tex. Health & Safety Code ch. 170A; Tex. Gov't Code § 2273.0031. Thus, no other basis for consideration could save the City's plan to fund abortion travel.

**B. Facilitating ending unborn children's lives is antithetical to "legitimate public purposes."**

To comply with the Gift Clause, "the predominant objective" of a disbursement must be "to accomplish a legitimate public purpose, not to provide a private benefit." *Borgelt*, 692 S.W.3d at 304. And a public purpose is one that "is beneficial to the inhabitants and directly connected with the local government." *Id.* (quoting *Davis v. City of Taylor*, 67 S.W.2d 1033, 1034 (Tex. 1934)). Facilitating abortions is not a public purpose. *See id.* (quoting *Davis v. City of Lubbock*, 326 S.W.2d 699, 709 (Tex. 1959)).

That fact is dispositive here because abortion travel is the sole "downstream" service that the City has ever expressed interested in funding. In fact, the Fund "was set up from the beginning to fund abortion access," and it specifically "anticipated funding travel for abortions." November 21 Meeting Minutes at 13, *supra*. At every City Council meeting about the $100,000, the Council's discussion centered around facilitating abortion. *See supra* pp. 2-11. And when Metro Health contacted organizations about applying for the funds, the only specific service it asked the organizations if they would be interested in providing was travel for out-of-state abortions. CR.20, 32, 90. Then when the City issued the request for proposals, it emphasized the *Dobbs* decision and the resulting drop in the number of abortions in Texas as the reason for requesting service proposals. *Supra* pp. 2-3.

### 1. The abortion travel payments would serve a *private*, not public, purpose.

Unlike "upstream" services, which are "policy approaches that have potential to affect large populations," the abortion travel funding is a "downstream" service, meaning it "direct[ly] services" "individual needs." CR.19, 26.

The City's request for proposals expressly sought "proposals to address 'downstream' *gaps* in San Antonio's reproductive health landscape, with particular attention to *abortion transportation* and support." *Second Request for Proposals*, *supra* (emphasis added). Put otherwise, the City can only spend the $100,000 on individualized services, which the City admits would not "have potential to affect large populations." CR.19, 26. The "record reflects that the City's ordinance permits organizations to apply for public funds that will benefit private parties." Order at 9. And even if the City musters a "bauble of public purpose" based on a collection of individual benefits, the Gift Clause still prohibits this disbursement because the public purpose would be merely "the caboose rather than the engine." *See Borgelt*, 692 S.W.3d at 304.

### 2. Ending unborn life is not a legitimate public purpose.

**a.** Rather than promote public purposes, the City's plan undermines the State's policies protecting unborn life. Since 1854 when "Texas criminalized abortion," the Texas "Legislature has continuously kept laws protecting fetal life in the law books, including criminal prohibitions on both procuring and furnishing the means of procuring an abortion." *Lilith Fund for Reprod. Equity v. Dickson*, 662

18

S.W.3d 355, 370 (Tex. 2023) (Devine, J., concurring). For example, the Texas Heartbeat Act protects unborn children from abortions beginning when their heartbeats can be detected. Tex. Health & Safety Code §§ 171.201-.212. And the Texas Human Life Protection Act protects unborn children from virtually all abortions, regardless of the child's age, except in cases of threat to the mother's life. *Id.* ch. 170A. "Texas law protects unborn children through a diverse array of statutes, ranging from the Estates Code to the Penal Code." *In re J.W.*, 645 S.W.3d 726, 756 & n.1 (Tex. 2022) (Boyd, J., dissenting) (collecting statutes).

These statutes reflect Texas's "strong public policy of preserving and protecting life"—especially unborn life—as well as "the foundational recognition of 'the dignity, sanctity, and profound value of life.'" *Noe v. Velasco*, 690 S.W.3d 1, 7 (Tex. 2024) (citation omitted); *see also Jacob E. Decker & Sons v. Capps*, 164 S.W.2d 828, 829 (Tex. 1942) (recognizing the "broad principle of the public policy to protect human health and life"); *Griggs Canning Co. v. Josey*, 164 S.W.2d 835, 835-36 (Tex. 1942) (same); *W.A. Morgan & Bros. v. Missouri, K. & T. Ry. Co. of Tex.*, 193 S.W. 134, 134 (Tex. 1917) (noting the "public policy which declines, under such circumstances, to legalize the destruction of human life"). Indeed, the Legislature has declared through statute what natural law declares through conscience: Protecting—not ending—unborn life is a "legitimate" purpose of good government. *See Borgelt*, 692 S.W.3d at 304.

**b.** Equally important to the Gift Clause analysis is the fact that facilitating abortion is not "beneficial to the inhabitants" of San Antonio. *See id.* at 304 (citation omitted). In reality, abortion inflicts at least three types of injuries.

*First*, it inherently injures—that is, murders—unborn children. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 242-50, 302-30 (2022) (surveying the common law and American history of classifying abortion as murder).

*Second*, abortion creates medical and mental-health risks for mothers. Abortions put women at greater risk of hemorrhaging, developing breast cancer, and having future pre-term births (which in turn put future babies at a greater risk of death and disability). Brief for American Association of Pro-life Obstetricians and Gynecologists in Support of Petitioners at 3-4, *Dobbs*, 597 U.S. 215 (No. 19-1392). And abortions "are linked to a greater risk of psychological harm, including anxiety, depression, substance abuse, thoughts of suicide, and suicide." *Id.* at 4.

*Third*, abortion harms society at large by hardening it "to the humanity of not only newborns, but all vulnerable and innocent human life, making it increasingly difficult to protect such life." *See Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (citation omitted); *Stenberg v. Carhart*, 530 U.S. 914, 961 (2000) (Kennedy, J., dissenting) (noting that allowing dismemberment abortions "might cause the medical profession or society as a whole to become insensitive, even disdainful, to life").

### 3. Abortion does not advance public health.

For these same reasons, the artifice of promoting "public health" does not substitute for a "legitimate public purpose." *See* CR.89, 285 (referring to "downstream" services as advancing "public health"). After all, health is a trait possessed by living people; abortion deprives aborted children of their health rather than pro-

moting it. Plus, abortion creates health risks for mothers like hemorrhaging and cancer. *Supra* p. 20. In short, abortion does not advance public health or any other "public purpose."

## C. The City's plan does not contemplate public control over the funds.

The City's plan also violates the gift clause because it does not retain public control over the funds. By all appearances, the City does not contemplate retaining control over the way organizations use the funds once the City has disbursed them. In fact, given the City's short timeline for disbursing the funds, the City's plan depends on the City *not* controlling the funds (*i.e.*, not having a way to stop the funds from being used). For example, when the City Council was approving the procurement ordinance, one councilmember asked the City when the disbursements would "have *been* spent"—such that the City would be unable to get the money back—and whether the disbursements could reach that point before SB 33 went into effect. City of San Antonio, *supra*, at 2:42:55-2:44:40. Lack of control is the point.

The closest the City has come to suggesting that it might retain control over the funds is the City Manager's comment at one City Council meeting that the City typically structures its service contracts so that the City reimburses, rather than pays up-front, for services. *Id.* at 2:44:30-2:46:00. But even then, the City Manager explained that funds could be "reimbursed" on a rolling basis (as abortion traveling happened) up until SB 33 went into effect on September 1. *Id.* And of course, given the City's desire for urgency in disbursements, the City could certainly structure its abortion-travel contracts with up-front payment plans.

21

But even if the City found a way to retain public control of the funds, the disbursements still fail the public-benefit and public-purpose requirements and thus violate the Gift Clause. *See supra* 15-21.

## II. Delaying Judicial Review Would Cause the State Great Hardship by Allowing the City to Violate the Gift Clause.

Because "the State has an intrinsic right to . . . enforce its own laws," *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (citation omitted), this Court has repeatedly recognized that a violation of the State's justiciable interest in the enforcement of its laws through "'*ultra vires* conduct' by local officials 'automatically results in harm to the sovereign as a matter of law,'" *In re State*, 711 S.W.3d at 647 (citation omitted). "Indeed, the violation of duly enacted state law by local government officials 'clearly inflicts irreparable harm on the State.'" *Id.* (citation omitted). So if the City disburses funds in violation of the Gift Clause, the State will sustain an irreparable injury. *Id.* And because of the unique circumstances of this case, delayed resolution of the Gift Clause violation "would foreclose any relief from the present injury suffered" by the State. *See Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 82 (1978).

### A. The State will suffer hardship if the City improperly disburses taxpayer dollars.

1. A Gift Clause violation occurs when funds are spent, not when they are allocated. *See In re State*, 711 S.W.3d at 648 (describing a Gift Clause violation as "public funds [being] irrecoverably spent"). As a result, the allocation itself will not often trigger an immediate risk of disbursement. Consider, for example, the State budget.

The Legislature is required to pass the budget each session, *see* Tex. Const. art. VIII, § 6, which concludes in May (absent a special session), for the next fiscal year, which begins on September 1, *see* Tex. Gov't Code § 316.071(a). So, the disbursements normally cannot occur for at least 90 days after legislative approval.

A similar situation occurred with "Uplift Harris," Harris County's unconstitutional universal-basic-income program. *See generally In re State*, 711 S.W.3d at 643 (describing same). There, Harris County approved its unlawful expenditure months in advance of the disbursements. *See* Brief for Appellees at 6-12, *State v. Harris County*, No. 15-24-00061-CV (Tex. App.—15th Dist. July 8, 2024). From the beginning, the County announced the dates it anticipated disbursing funds, always doing so months ahead of time. *See id.* More importantly, the County *could not* disburse the funds immediately because it did not select the recipients until almost nine months after the Commissioners Court approved the program. *See id.* at 7, 11-12.

That timeline starkly contrasts with the one here. The City hand-selected the 10 organizations that could apply for the abortion-travel funds, and the application deadline was months ago. *See Second Request for Proposals*, *supra*. So when the City approves the contracts, it will do so already knowing the recipient organizations' identities; it will not need to spend months sifting through applications like Harris County. Moreover, that the City had a looming September 1 deadline to disburse the funds before SB 33's effective date answers any question about the plan's illegality.

And, despite that initial deadline passing, the City now claims that it could disburse the funds until September 30 when its fiscal year ends. Pet. for Writ of Mandamus at 17-18. In contrast, Harris County was up against the clock only to *earmark*

23

the funds, not to disburse them. *See In re State*, 711 S.W.3d at 648 n.5 ("The County . . . must spend the funds by September 30, 2026, but it must 'commit' funds to Uplift Harris by December 31, 2024.").

**2.** The difference here is one of timing. Rather than disburse the funds in the normal course, the City intends to disburse funds as quickly as possible. The City has consistently maintained that it intended to execute and begin implementing the abortion-travel contracts in June 2025. *Supra* p. 8. And the City told the Supreme Court in its mandamus petition that the reason it has *not* done so yet is because of its mistaken belief that this Court's order prohibits it from executing the contracts, not just from disbursing the funds. Pet. for Writ of Mandamus at 15. *Contra* Order at 12. "[I]t is a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent." *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999). The same goes for the City Council.

So—absent this Court's maintenance of the injunction pending appeal—the period between when the City approves the contracts and when it transfers the funds out of the public treasury would likely be too short for the State to obtain relief preventing irreparable harm to its sovereignty. *See In re State*, 711 S.W.3d at 647. The ripeness doctrine, however, "serves to avoid premature adjudication," not to delay adjudication until an injury is unavoidable. *See Perry*, 66 S.W.3d at 250. The "practical harms on the interests advanced by" the State caused by delaying review therefore constitute sufficient hardship to create a ripe controversy. *See Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012).

**3.** The risk to the State's sovereignty is compounded by the fact that Bexar County's local rules effectively immunize the City from a temporary restraining order ("TRO") for three days after the State requests one. Courts generally must hold a hearing before granting a TRO, and the movant must serve notice of the hearing at least three days in advance (unless the court shortens that time). *See* Tex. R. App. P. 21(b), 680. But Texas Rule of Civil Procedure 680 allows a court to hear a TRO application *ex parte* if there is not enough time for notice and a hearing. *Id.*; *In re Abbott*, 628 S.W.3d 288, 299 (Tex. 2021) (orig. proceeding); Tex. R. Civ. P. 21(b).

Bexar County, however, narrowed that exception through its local rules to permit *ex parte* TROs when "notifying the respondent or his counsel would cause irreparable harm to the movant." Bexar Cnty. Loc. R. 6C, available at www.bexar.org/DocumentCenter/View/40208/Bexar-County-Civil-District-Court-Local-Rules-2024. And the local rules do *not* provide for a "so-called ex parte TRO" that is called *ex parte* "only because it happens so quickly" but for which the movant must still give notice. *Contra* RR.23-24. Rather, requiring three days' notice for TRO hearings is not only provided for in the local rules but appears to be common practice in Bexar County. *See* RR.24 (stating that the trial court's suggested 'so-called ex parte' procedure "is not what was explained to" the State when it "called the court to attempt to set a TRO on the docket").

Here, it is not the notification itself that will cause irreparable harm to the State but rather the delay of the hearing. *Cf.* Appellant's Emergency Motion for Temporary Order at 4-7, *State v. Callanen*, No. 15-24-00099-CV (Tex. App.—15th Dist. Sept. 16, 2024) (explaining that the State sought a TRO prohibiting Bexar County

from mailing unsolicited voter-registration applications on same day Commissioners Court approved contract to do so, and that the County mailed all of the applications before the TRO hearing). And if the State needs to seek appellate review to obtain relief, that delay would compound the State's irreparable harm. After all, the denial of a TRO is not appealable, *see* Tex. Civ. Prac. & Rem. Code § 51.014(a); *In re Tex. Nat. Res. Conservation Comm'n*, 85 S.W.3d 201, 205 (Tex. 2002) (orig. proceeding), so the State would have to wait until after a temporary injunction hearing to seek this Court's review, *see* Tex. Civ. Prac. & Rem. Code § 51.014(a)(4).

The City has correctly noted that the Texas Open Meetings Act requires the City Council to provide 72 hours' notice of any meeting at which the Council could vote on whether to disburse funds. Tex. Gov't Code § 551.043. But as an initial matter, it is unclear whether 72 hours' notice would be enough time for the State to obtain a TRO given Bexar County's three-day notice requirement for TROs. And even that timeline excludes the opportunity for the State to seek appellate relief if necessary. But more importantly, the City's theory is that the case will not ripen until *after* the City Council votes, so (in the City's view) the amount of notice that the City Council gives of its meeting is irrelevant.

But even though the City's suggestion that the State could sue ahead of the meeting is inconsistent with its own position, it *is* correct. That is because "[t]he ripeness doctrine does not compel Texas courts to wait until the football is inches from the endzone before blowing a whistle to stop the play." Order at 10. After all, by the time the City is that close to the metaphorical endzone, it may be too late to stop the disbursements from becoming irrevocable.

26

## B. The importance of the State's interest in enforcing the Texas Constitution weighs in favor of jurisdiction.

The Supreme Court's "functional approach" to ripeness requires courts to weigh "the importance of the interest advanced" and "the extent of the injury or risk," *Perry*, 66 S.W.3d at 251-52 (quoting 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3532.1 (2d ed. 1984))—both of which favor the State.

The State faces an irreparable sovereign injury, *In re State*, 711 S.W.3d at 647, that cannot be remedied if the City disburses the funds. After all, prospective injunctive relief is the only type of relief available in an ultra vires suit. *See Hollins*, 620 S.W.3d at 410. Thus, reviewing the issue now will "advance rather than impede the administrative enforcement of the" Gift Clause. *Cf. E.P.A. v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 73 n.12 (1980). The City, by contrast, "will suffer no cognizable injury unless its legal rights are incorrectly circumscribed during the pendency of the appeal." *In re State*, 711 S.W.3d at 648. But "being required to follow the Texas Constitution" is not such an injury. *Id.* Indeed, requiring "the government to follow the law benefits everyone." *Id.*

## III. The Gift Clause Violation is Fit for Review Because the City's Illegal Activity is "Likely to Occur."

**A.** As this Court explained, "jurisdiction does not turn on waiting to see what could happen if the result is likely." Order at 10. "Rather, 'ripeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Id.* (quoting *Patterson*, 971 S.W.2d at 442). That inquiry considers whether "deciding the substantive issues" is difficult

27

without additional "specific factual illumination." *Perry*, 66 S.W.3d at 251-52 (quoting Wright & Miller, *supra*).

No such difficulty exists here. "[T]he court would be in no better position to adjudicate the issues in the future than it is now," *see Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (quoting *Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003)), because the City's plan is by no means "abstract or hypothetical," *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012). In fact, the Court may be in no position at all "to adjudicate the issues" if it delays review because the case will be moot once the City disburses the funds. *Id.* at 727 (Dennis, J., dissenting). After all, once the City disburses the funds, the constitutional violation—that is, the State's injury—would be complete; and no post hoc relief could remedy that injury.

"[T]he only remedies available in an *ultra vires* action" or a suit challenging the constitutionality of a local policy are "injunctive and declaratory relief." *Hollins*, 620 S.W.3d at 410; *see Rolling Plains Groundwater Conservation Dist. v. City of Aspermont*, 353 S.W.3d 756, 760 (Tex. 2011) (per curiam); *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007) (per curiam). After the City disburses the funds, no prospective injunctive relief can recoup the money that goes out the door.

But ripeness "is not like an avocado, good only for a few days between unripeness on one end and spoiling on the other." Order at 8. So the Court need not wait to decide the case until the State can no longer enforce the Texas Constitution's limits on governmental power. Indeed, holding otherwise contradicts the principle that this Court always has jurisdiction to protect its own jurisdiction. *See* Tex. Gov't

28

Code § 21.001; *In re Tex. Educ. Agency*, 619 S.W.3d 679, 685-86 (Tex. 2021) (orig. proceeding).

**B.** The City is already well underway with its plan to fund abortion-travel. To date, the City has taken up the recommendation of several councilmembers to allocate $100,000 to "downstream" services, but out-of-state abortion travel is the only "downstream" service that the City has identified. *See* CR.29-30. That $100,000 would come, of course, from a Fund that "was set up from the beginning to fund abortion access" and that specifically "anticipated funding travel for abortions." November 21 Meeting Minutes, *supra*, at 13.

Metro Health then held an interest meeting with ten hand-picked organizations about submitting proposals for the $100,000. CR.20, 89. After the meeting, Metro Health sent the organizations a form expressly asking if they would be interested in additional funds specifically for travel for out-of-state abortions—that is, *not* including any other downstream services. CR.20, 32, 90. When three organizations said yes, Metro Health asked the City Council to "authorize an expedited procurement" of "downstream services" that "may include out-of-state travel" for abortions. CR.20, 90.

And when the Legislature began its efforts to stop cities from funding abortion travel, the City Council discussed whether it would be possible to spend the money before SB 33 went into effect. April 3 Meeting Minutes, *supra*, at 5. The City Council promptly passed an ordinance approving an expedited procurement process to find services on which to spend the $100,000. CR.89-91. And multiple sections of the ordinance specifically highlighted out-of-state travel to obtain abortions. CR.89-90.

Pursuant to that ordinance, Metro Health issued a request for proposals "to address 'downstream' *gaps* in San Antonio's reproductive health landscape, with particular attention to *abortion transportation* and support." *Second Request for Proposals*, *supra*.

**C.** Even if these facts did not demonstrate ripeness at the time, "just as a case may become moot after it is filed, it may also ripen." *Perry*, 66 S.W.3d at 251. And here events during this lawsuit demonstrate that the case is ripe or, at the very least, that it "will soon become ripe." *See id.* Given that the submission period has closed and that the City was scheduled to complete the scoring process over two months ago, CR.30, 73, 259; *Second Request for Proposals*, *supra*, there is nothing left for the City to do except approve the contracts and disburse the funds. The City's timeline for those steps was always June 2025, *supra* p. 8, and the City has since admitted that the City Council "would have [already] voted to approve contracts" for the planned services "[b]ut for" this Court's order. Pet. for Writ of Mandamus at 15.

The City's mistaken reading of this Court's order as ordering the City to refrain from "enacting ordinances" about the $100,000, *id.* at 14, does not rob this Court of jurisdiction. The Order prohibited the City "from distributing"—not approving— "payments from the $100,000." Order at 12; *cf. In re State*, 711 S.W.3d at 648 n.5 ("[T]he State does not ask us to prevent the County from earmarking or assigning federal funds to the program. Today's stay prevents the County from disbursing the funds to individual recipients or to third-party intermediaries until further order of this Court."). And that Order remains necessary given the City's representations that it would have approved the funds and would now be poised to disburse the funds whenever it pleases "[b]ut for" its reading error. Pet. for Writ of Mandamus at 15.

In short, the Gift Clause violation is fit for review because, even though the injury "has not yet occurred," it "is sufficiently likely to happen to justify judicial intervention." *See Pearson*, 624 F.3d at 684 (quoting *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993)). That the City has not yet driven the final nails into the coffin does not deprive this Court of jurisdiction. *Cf. Ackers v. Comerica Bank & Tr., N.A., Tr. of Larry Ackers Generation Skipping Tr.*, 654 S.W.3d 750, 752 (Tex. 2022) (Busby, J., concurring in the denial of the petition for review) ("Although a contingent interest [in a remainder distribution], by definition, is conditioned on the occurrence of an event that may or may not take place, . . . this does not mean that every suit involving a contingent interest is unripe." (citation omitted)); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 144 (1974) (explaining that a challenge a to future conveyance was ripe because, even though the railroad plan requiring the conveyance had not been finalized, delaying judicial review until *after* the plan was finalized would render the conveyance practically irreversible under the circumstances). After all, a "delay in decision will create the serious risk that" future review will come "too late to prevent" the disbursements if they are "found unconstitutional." *See Blanchette*, 419 U.S. at 145 (1974).

**D.** Finally, while SB 33—in effect as of September 1—plainly prohibits the City's plans to fund out-of-state abortion travel, the City's representations in its Petition for Writ of Mandamus indicate that this dispute remains live through September 30, 2025. A case becomes moot if "there has ceased to exist a justiciable controversy between the parties—that is, if the issues presented are no longer 'live,' or if

31

the parties lack a legally cognizable interest in the outcome." *Heckman v. Williamson County*, 369 S.W.3d 137, 162 (Tex. 2012).

Here, a live controversy remains because the City indicated that it believes it can disburse the funds until September 30 when its fiscal year ends. Pet. for Writ of Mandamus at 17-18. While it is unclear how the City contemplates circumventing SB 33, the City's assertion that it can disburse the funds until September 30, combined with its demonstrated efforts to circumvent the State's pro-life laws, suffices to constitute a continuing justiciable controversy.

## Prayer

The Court should reverse.

Respectfully Submitted.

KEN PAXTON
Attorney General of Texas

WILLIAM R. PETERSON
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

WILLIAM F. COLE
Principal Deputy Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Nathaniel A. Plemons
NATHANIEL A. PLEMONS
Assistant Solicitor General
State Bar No. 24121059
Nathaniel.Plemons@oag.texas.gov

Counsel for the State of Texas

## Certificate of Compliance

Microsoft Word reports that this brief contains 8,593 words, excluding exempted text.

/s/ Nathaniel A. Plemons
NATHANIEL PLEMONS

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Maria Mendoza-Williamson on behalf of Nathaniel Plemons
Bar No. 24121059
maria.williamson@oag.texas.gov
Envelope ID: 105856355
Filing Code Description: Other Brief
Filing Description: 250919 SA Abortion Travel Opening Brief
Status as of 9/19/2025 4:35 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kennon Wooten | 24046624 | kwooten@scottdoug.com | 9/19/2025 4:25:26 PM | SENT |
| Deborah Klein | 11556750 | Deborah.Klein@sanantonio.gov | 9/19/2025 4:25:26 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 9/19/2025 4:25:26 PM | SENT |
| Lauren Ditty | 24116290 | lditty@scottdoug.com | 9/19/2025 4:25:26 PM | SENT |
| Abril Rivera | | arivera@scottdoug.com | 9/19/2025 4:25:26 PM | SENT |
| Jordan Kadjar | | jkadjar@scottdoug.com | 9/19/2025 4:25:26 PM | SENT |
| Carla Matheson | | cmatheson@scottdoug.com | 9/19/2025 4:25:26 PM | SENT |

Associated Case Party: The State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy Hilton | 24097834 | Amy.Hilton@oag.texas.gov | 9/19/2025 4:25:26 PM | SENT |
| Katherine Pitcher | 24143894 | katherine.pitcher@oag.texas.gov | 9/19/2025 4:25:26 PM | SENT |
| Nathaniel Plemons | | nathaniel.plemons@oag.texas.gov | 9/19/2025 4:25:26 PM | SENT |